ANNA Y. PARK, SBN 164242
MICHAEL J. FARRELL, CA SBN 266553
SUE J. NOH, CA SBN 192134
LORENA GARCIA-BAUTISTA, CA SBN 234091
U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
255 E. Temple Street, 4th Floor
Los Angeles, California 90012
Telephone: (213) 894-1082
Facsimile: (213) 894-1301
E-mail: lado.legal@eeoc.gov

Attorneys for Plaintiff EEOC

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>GLOBAL HORIZONS, INC. D/B/A GLOBAL HORIZONS MANPOWER, INC.; GREEN ACRE FARMS, INC.; VALLEY FRUIT ORCHARDS, LLC; AND DOES 1-10, INCLUSIVE;<br><br>Defendants. | ) CIVIL ACTION NO. CV-11-<br>) 3045-EFS<br>)<br>)<br>)<br>) **FIRST AMENDED**<br>) **C O M P L A I N T**<br>)<br>) JURY TRIAL DEMAND<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## I.    NATURE OF THE ACTION

1.    This is an action under Title VII of the Civil Rights Act of 1964 and Title I of the Civil Rights Act of 1991 to correct unlawful employment practices on the basis of national origin, race, and retaliation, and to provide appropriate relief

First Amended Complaint - 1

to Marut Kongpia, Laphit Khadthan, and the class of similarly situated Thai and/or Asian individuals (collectively, the "Claimants") who were adversely affected by such practices.  As alleged with greater particularity below, the EEOC asserts that Defendants engaged in discrimination and a pattern or practice of discrimination when they subjected the Claimants to harassment, disparate treatment, and constructive discharge on the basis of the Claimants' national origin (Thai) and/or race (Asian), and engaged in retaliation.

## II.    JURISDICTION AND VENUE

2.    Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345.  This action is authorized and instituted pursuant to Sections 706(f)(1) and (3) and 707 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-5(f)(1) and (3) and -6 ("Title VII") and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

3.    A substantial part of the employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the Eastern District of Washington.

## III.    PARTIES

4.    Plaintiff, the Equal Employment Opportunity Commission (the "Commission"), is the agency of the United States of America charged with the administration, interpretation, and enforcement of Title VII, and is expressly authorized to bring this action by Sections 706(f)(1) and (3) and 707 of Title VII, 42 U.S.C. §§ 2000e-5(f)(1) and (3) and -6.

5.    At all relevant times, Defendant Global Horizons, Inc. dba Global Horizons Manpower, Inc. ("Global") has continuously been a California corporation doing business in the State of Washington and the County of Yakima, and has continuously had at least 15 employees.

First Amended Complaint - 2

6.      At all relevant times, Defendant Global has continuously been an employer engaged in an industry affecting commerce within the meaning of Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

7.      At all relevant times, Defendant Green Acre Farms, Inc. ("Green Acre") has continuously been a Washington corporation doing business in the State of Washington and the County of Yakima, and has continuously had at least 15 employees.

8.      At all relevant times, Defendant Green Acre has continuously been an employer engaged in an industry affecting commerce within the meaning of Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

9.      At all relevant times, Defendant Green Acre has continuously been under contract with Defendant Global for services rendered in Washington, and has continuously been a joint employer with Defendant Global where both generally controlled the terms and conditions of the employment of Laphit Khadthan and similarly situated individuals.

10.     Global and Green Acre jointly controlled the Claimants' work, housing, transportation, and access to food; jointly supervised the Claimants and/or Green Acre exercised successively higher authority over the Claimants through its control of the terms of its contracts with Global; jointly determined the pay rates or the methods of payment; jointly held the right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers; and jointly participated in the preparation of payroll and the payment of wages.

11.     Green Acre's joint employer liability also stems from Green Acre's ownership or control of the land, housing, transportation, and worksite, which placed it in a position to prevent the violations of Title VII alleged herein, even through it delegated hiring and some supervisory responsibilities to Global.

12.     The Claimants were economically dependent on Green Acre due to Green Acre's investment in equipment and facilities.

First Amended Complaint - 3

13.     The Claimants performed routine tasks that are a normal and integral phase of Green Acre's production making them dependent on Green Acre's overall production process.

14.     Green Acre maintained on-the-job control over Claimants through Global and on-site crew leaders who in turn spoke directly to the Claimants.

15.     At all relevant times, Defendant Valley Fruit Orchards, LLC ("Valley Fruit") has continuously been a Washington limited liability company doing business in the State of Washington and the County of Yakima, and has continuously had at least 15 employees.

16.     At all relevant times, Defendant Valley Fruit has continuously been an employer engaged in an industry affecting commerce within the meaning of Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

17.     At all relevant times, Defendant Valley Fruit has continuously been under contract with Defendant Global for services rendered in Washington, and has continuously been a joint employer with Defendant Global where both generally controlled the terms and conditions of the employment of Marut Kongpia and similarly situated individuals.

18.     Global and Valley Fruit jointly controlled the Claimants' work, housing, transportation, and access to food; jointly supervised the Claimants and/or Valley Fruit exercised successively higher authority over the Claimants through its control of the terms of its contracts with Global; jointly determined the pay rates or the methods of payment; jointly held the right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers; and jointly participated in the preparation of payroll and the payment of wages.

19.     Valley Fruit's joint employer liability also stems from Valley Fruit's ownership or control of the land, housing, transportation, and worksite, which placed it in a position to prevent the violations of Title VII alleged herein, even through it delegated hiring and some supervisory responsibilities to Global.

First Amended Complaint - 4

20.    The Claimants were economically dependent on Valley Fruit due to Valley Fruit's investment in equipment and facilities.

21.    The Claimants performed routine tasks that are a normal and integral phase of Valley Fruit's production making them dependent on Valley Fruit's overall production process.

22.    Valley Fruit maintained on-the-job control over Claimants through Global and on-site crew leaders who in turn spoke directly to the Claimants.

23.    Defendants Green Acre and Valley Fruit (collectively, the "Farm Defendants") are persons against whom a right to relief is asserted jointly, severally, or out of the same transaction or series of transactions. Additionally, questions of law or fact common to all Defendants will arise in this action. The Farm Defendants are named as parties pursuant to Fed. R. Civ. P. Rule 20(a)(2) in that Defendant Global and the Farm Defendants, at all relevant times, acted as joint employers with regard to the relevant Claimants.

24.    Plaintiff is ignorant of the true names and capacities of each Defendant sued as DOES 1 through 10, inclusively, and therefore Plaintiff sues said defendants by fictitious names. Plaintiff reserves the right to amend the complaint to name each DOE defendant individually or collectively as they become known. Plaintiff alleges that each DOE defendant was in some manner responsible for the acts and omissions alleged herein and Plaintiff will amend the complaint to allege such responsibility when the same shall have been ascertained by Plaintiff.

25.    All the acts and failures to act alleged herein were duly performed by and attributable to each DOE, each acting as a successor, agent, alter ego, employee, indirect employer, joint employer, integrated enterprise, and/or under the direction and control of the another DOE and/or named Defendant, except as specifically alleged otherwise. Said acts and failures to act were within the scope of such agency and/or employment, and each DOE participated in, approved and/or

First Amended Complaint - 5

ratified the unlawful acts and omissions by another DOE or Defendants complained of herein. Whenever and wherever reference is made in this Complaint to any act by a DOE or DOES, such allegations and reference shall also be deemed to mean the acts and failures to act of each DOE and named Defendants acting individually, jointly, and/or severally.

## IV.    GENERAL ALLEGATIONS

26.    More than thirty days prior to the institution of this lawsuit, Marut Kongpia filed a charge with the Commission alleging violations of Title VII by Defendant Global. All conditions precedent to the institution of this lawsuit have been fulfilled by the EEOC, including, giving notice of Marut Kongpia's charge to Global, investigating the charge, issuing a reasonable cause determination, and engaging in good faith to conciliate the matter on behalf of Marut Kongpia and the class of similarly situated Thai and/or Asian individuals.

27.    More than thirty days prior to the institution of this lawsuit, Laphit Khadthan filed a charge with the Commission alleging violations of Title VII by Defendant Green Acre. All conditions precedent to the institution of this lawsuit have been fulfilled by the EEOC, including, giving notice of Laphit Khadthan's charge to Green Acre, investigating the charge, issuing a reasonable cause determination, and engaging in good faith to conciliate the matter on behalf of Laphit Khadthan and the class of similarly situated Thai and/or Asian individuals.

28.    More than thirty days prior to the institution of this lawsuit, Marut Kongpia filed a charge with the Commission alleging violations of Title VII by Defendant Valley Fruit. All conditions precedent to the institution of this lawsuit have been fulfilled by the EEOC, including, giving notice of Marut Kongpia's charge to Valley Fruit, investigating the charge, issuing a reasonable cause determination, and engaging in good faith to conciliate the matter on behalf of Marut Kongpia and the class of similarly situated Thai and/or Asian individuals.

First Amended Complaint - 6

*ALLEGATIONS PERTAINING TO GLOBAL*

29.    Global recruited foreign nationals under the U.S. Department of Labor ("DOL") H2-A guest worker program to work as farm workers throughout the United States, including farms in Washington.  The H2-A workers who worked at the named Farm Defendants' worksites are the Claimants.

30.    Mordechai Yosef Orian aka Motty ("Orian") was Global's Chief Executive Officer.

31.    Pranee Tubchumpol aka Som ("Tubchumpol") was Global's Director of International Relations and was the liaison between Global, the Claimants, and the Thai recruiting companies and authorities.

32.    Global employed Bruce Schwartz ("Schwartz") as its Operations Manager, interviewer, and as an on-site supervisor for farms where the Claimants worked.

33.    Beginning in or about March 2003 and continuing through in or about December 2006, Schwartz associated with Orian and others affiliated with Global. Throughout the time Schwartz associated with Orian and others affiliated with Global, Global was engaged in a scheme to recruit impoverished Thai nationals into agricultural labor in the United States and to ensure the H-2A guest workers remained in Global's service using their excessive debts and control over the workers' passports to keep them from escaping.

34.    In or about April 2003, Schwartz stole Taft Vegetable Farm (Bakersfield, California), stationery from Taft Vegetable Farm owner and Orian crafted a letter on the stationery that falsely stated Taft Vegetable needed 250 agricultural workers to harvest crops.

35.    Orian told Schwartz that he needed the letter to obtain workers through the U.S. Department of Labor H-2A guest workers program to

First Amended Complaint - 7

demonstrate there was a shortage of U.S. workers and that when the foreign workers arrived they could move them around to various farms.

36.     In or about December 2006, at Orian's request, Schwartz signed a false affidavit about the fraudulent Taft Vegetable Farm letter.  Said affidavit was submitted to the U.S. Department of Labor in support of Orian's appeal from its debartment in the H-2A guest worker program.

37.     In or about January 2004, Schwartz traveled to Thailand at Orian's direction, and interviewed Thai nationals at K.S. Manpower, Inc., a Thai labor recruiting company.

38.     Between April 2004 and May 2004, Schwartz and Tubchumpol met with officials of the Thai Department of Labor and the U.S. Embassy who expressed concerns over excessive recruitment fees being paid by the Thai nationals who were jointly recruited by Thai recruiters and Global.

39.     During the trip to Thailand, Schwartz and Tubchumpol heard Thai labor recruiter Rattawan Chunharutai tell the Thai nationals who were being recruited for Global, that they would have to pay up front recruitment fees and to secure loans to pay the fees using their houses and land as collateral.

40.     After returning home from the Thailand recruitment trip, Schwartz told Orian that the Thai nationals were paying excessive recruitment fees.

41.     Schwartz knew that neither he nor Global could promise the Thai national up to three years of steady employment in the United States because Global could not procure H-2A guest worker visa for more than 10 months because the H-2A guest workers program is seasonal and temporary.

42.     Nonetheless, Schwartz, Tubchumpol, and Global continued to recruit Thai nationals for Global with promises of up to three years of steady employment at high wages.

43.     Between June 2004 and November 2004, Schwartz worked for Global in Washington State as an onsite supervisor.  At Orian's direction, Schwartz

First Amended Complaint - 8

confiscated the Thai nationals' passports when they arrived in the United States to prevent them from escaping.

44.    Global employed Joseph Knoller ("Knoller") as its Vice-President of Operations and as a consultant.

45.    In or about November 2004, Orian sent Knoller to Yakima, Washington to provide security so that the Thai H-2A guest workers would not run away and would remain in Global's service.  Knoller hired a detention force, including one person who stated was a former FBI agent.

46.    Schwartz, Knoller, and Tubchumpol, met with the Thai H-2A guest workers and told the workers that they could not leave the apartment where they were living.  Detention guards parked their cars outside the apartment to prevent the workers from leaving.  At this time, Schwartz, Knoller, and Tubchumpol knew that the workers were afraid that leaving Global's service would expose them and their families to a risk of financial ruin because of the insurmountable debts they incurred, some of them to Global itself, in connection with Global's recruitment scheme.

47.    Global employed Shane Germann ("Germann") as an on-site manager at farms where the Claimants worked and as a regional supervisor.  Orian, Tubchumpol, Schwartz and Knoller all supervised Germann.

48.    Beginning in or about May 2003 and continuing through in or about February 2006, Germann was employed by Orian and Global.

49.    At the direction of Orian, Tubchumpol and/or Knoller, Germann confiscated the Thai national's passports when they arrived in the United States to prevent them from escaping.

50.    Between May 2003 and February 2006, Germann observed Tubchumpol confiscate the Thai H-2A guest workers' passports when they arrived in the United States.

First Amended Complaint - 9

51.    Between May 2003 and February 2006, Germann would send the Thai H-2A guest workers' passports by federal express to the Global' office in Los Angeles, California, where the passports where held.

52.    Between May 2003 and February 2006, a Global employee, who worked in the Los Angeles, California office, would send Germann the Thai H-2A guest workers' passports so they could fly to other work locations in the United States.

53.    In late August 2005, through early September 2005, Orian and Knoller, directed Germann, Sam Wongsesanit, and another person, to secure the perimeters of the Maui Pineapple housing compound to prevent the Thai guest workers from running away.

54.    In late August 2005, Tubchumpol arrived in Hawaii carrying the Thai H-2A guest workers' passports.

55.    In later August 2005, Tubchumpol held a meeting with the Thai H-2A guest workers, Germann, Knoller, and Sam Wongsesanit, and other persons who Global had employed as detention guards. Tubchumpol told the Thai H-2A guest workers that they were being sent back to Thailand immediately.

56.    In early September 2005, Germann, Tubchumpol, Knoller, and other detention guards employed by Global, escorted the Thai H-2A guest workers from Maui to Honolulu, Hawaii.

57.    In early September 2005, at the Honolulu, Hawaii airport, Germann, Tubchumpol, Knoller, and other detention guards employed by Global, watched and guarded the Thai H-2A guest workers to ensure they boarded their airplane and returned back to Thailand.

58.    In early September 2005, Tubchumpol handed each Thai H-2A guest workers his passport as he boarded the plane and Tubchumpol escorted the Thai nationals back to Thailand.

First Amended Complaint - 10

59.     In or about May 2005, Orian purchased a Piper Aztec airplane and transported the Thai H-2A guest workers between islands.

60.     Global employed Sam Wongsesanit ("Wongsesanit") as an on-site field supervisor at various farms.  Wongsesanit reported to Orian, Tubchumpol, Schwartz, Knoller, and Germann.

61.     During the time Wongsesanit was employed by Global, Wongsesanit was told by the Thai H-2A workers that they had paid excessive recruitment fees procured by substantial debts to get the U.S. jobs.

62.     At the direction of Pranee Tubchumpol and Shane Germann, Wongsesanit confiscated the Thai H-2A guest workers' passports.

63.     Wongsesanit knew that some of the Thai nationals voiced their reluctance to relinquish their passports.

64.     Wongsesanit would send via Federal Express, the Thai H-2A guest workers' passports, which included their visas, to Global's office in Los Angeles, California where the passports were held.

65.     Pranee Tubchumpol, Shane Germann, and Joseph Knoller directed Wongsesanit to conduct roll call and bed checks to ensure that the Thai nationals did not run away.

66.     Global employed Charlie Blevins ("Blevins") as its Operations Manager at various farms.

67.     Global employed Sam Prinya as a field supervisor at various farms.

68.     A.A.C.O. International Recruitment Co., Ltd. ("AACO") is a Thai labor recruiting company that recruits Thai nationals to work outside of Thailand, and Ratawan Chunharutai ("Chunharutai") represented herself as both the owner and Managing Director of AACO.  Podjanee Sinchai is a Thai labor recruiter who operated a licensed recruiting agency named Podjanee International Co., formerly named A Go International Co.  Sujittraporn (first name unknown) is a Thai labor recruiter for KS Company.

First Amended Complaint - 11

69.    Global gave ACCO and KS Company power of attorney to recruit workers from Thailand.  But Global did not pay any fees or costs to either recruiting company for their services.  Tubchumpol and Schwartz conducted interviews of candidates in Thailand at the respective offices of AACO and KS Company.  Tubchumpol also visited some Thai workers in their hometowns in provinces distant from Bangkok.   AACO paid for Tubchumpol's hotel, took her out to dinner, and paid for some of the visits she made to the remote Thai provinces.  KS Company also paid for Tubchumpol's visits to Thailand.  ACCO's owner Chunharutai referred Tubchumpol to work for Global.

70.    Tubchumpol and/or ACCO prepared translations of documents required by the H2-A program including but not limited to Clearance Orders and employment agreements.

71.    Global brought approximately 600 Thai nationals to work in the United States under the U.S. Department of Labor H2-A seasonal and temporary guest worker program to work on farms throughout the United States, including Hawaii and Washington.

72.    Global's recruiters sought impoverished Thai nationals to work at farms in the United States by enticing the Thai nationals with false promises of high wages, and up to three years of steady employment.

73.    Global's Thai recruiters told Claimants that Global sought uneducated and poor workers because such persons were less likely to try to escape.  One recruiter told a Claimant to hide the fact that he had a college degree and to say that he had a fourth grade education.  Global's recruiters told Claimant PM who had a sixth grade education that if he were more educated he would not qualify because the desired candidates were those who would not ask too many questions, show curiosity, or otherwise appear to have the potential to cause trouble.  Global's recruiters asked Claimant PP whether he had any family in the U.S. and whether he spoke English because Global presumably did not want workers who could

First Amended Complaint - 12

complain.  When Claimant PP arrived in the U.S., Tubchumpol reinterviewed him to confirm he did not speak English and that he had no family in the U.S.  When Claimant TC stated that the had completed the twelfth grade and knew some English, he was told to hide his educational background and say he only had a sixth grade education because the employers believed that more highly educated workers were less likely to do what they were told.  Global's recruiters also advised Claimant WK that he would not be qualified for the job if he spoke English because workers who spoke English could run away.

74.   Orian made comments suggesting that he targeted Thai workers based because Orian presumed that Thai workers were willing to "just follow" by stating, "The Thai people, they are good people, nice people. And they just follow. . . ." Orian further stated that he had previously hired workers from Mexico, China, and Nepal but that the problem with those workers was that they would often disappear.  The Thai workers, however, would not leave.  He said, "That's why we decide to go with Thailand, because the ration – ratio at that time of people who be absconded was 3 percent, 2 percent compared to 80 percent, 90 percent, 100 percent from other countries . . . ."  Orian continued,"[S]o you just go to countries. You know it's going to be easier and they're going to stay on the job... That's why Thailand."

75.   Global and AACO required that the Claimants pay substantial recruitment fees to secure the U.S. jobs, knowing that they were impoverished and would have to borrow the money using their family land as collateral to secure the substantial debt.

76.   Global knew that the Claimants had incurred high debts to secure the U.S. jobs, directed or made threats to banish the Claimants back to Thailand, knowing the Claimants and their families had no means of repaying the debts, and would face serious economic harm as a direct result of the debts incurred as a

First Amended Complaint - 13

result of the recruitment scheme and the false promises of steady, long-term employment at high wages.

77.    Global promised the Claimants' working conditions that complied with U.S. law in exchange for exorbitant recruiting fees.

78.    Global harassed and intimidated the Claimants on a regular basis.

79.    Global regularly threatened the Claimants with deportation, arrest, suspension, and/or physical violence.

80.    Global unlawfully confiscated the Claimants' identification documents.

81.    Global subjected the Claimants to uninhabitable housing, insufficient water, food, and kitchen facilities, inadequate pay, significant gaps in work, visa and certification violations, suspension, deportation, and/or physical violence at the hands of Global supervisors.

82.    Global failed to pay some Claimants at all.  Numerous Claimants received pay stubs reflecting a check in the amount $0 for work performed at the Farm Defendants' farms, including Green Acre and Valley Fruit.

83.    Global told numerous Claimants that it had wired their pay to their families in Thailand, but when Claimants contacted their families, their pay had not been sent to the Claimants' families.  When Claimants confronted Global's management including without limitation Tubchumpol, she would get upset and say that the Claimants complained too much and threatened to banish them back to Thailand or to farms that had less available work.

84.    Global subjected the Claimants to intolerable working conditions that resulted in constructive discharge.

85.    To prevent Claimants from escaping the conditions, Global representatives personally confiscated and directed its on-site field supervisors to confiscate the Claimants' passports and visas upon arrival in the U.S. in Hawaii

First Amended Complaint - 14

and Washington, and at various airports throughout the U.S. where the Claimants were transported to work, to restrict the Claimants.

86.    In or about the Summer of 2004, in Maui, Hawaii, Joseph Knoller, called a meeting of Claimants and told them that he did not want anyone escaping; that a worker who previously escaped had been shot; and that only if "you have power or wings" can you "flyaway from the island."

87.    In or about the Summer of 2004, in Maui, Hawaii, Knoller, after accusing Claimant AH of encouraging other Claimants to escape and of withholding information about their whereabouts, slapped Claimant AH and threatened to send him home.

88.    In or about October 2004, Global sent Claimants BK, KA, and approximately twenty-one other Claimants from Washington State to Maui, Hawaii.  Schwarz handed the Claimants their passports in Washington State so they could board the airplane and Wongsesanit confiscated the Claimants' passports in Maui when they landed as ordered by Germann.

89.    Global compelled the Claimants' labor and service by threatening to banish them back to Thailand when they complained about late or shorted wages, insufficient work hours, poor housing and work conditions, lack of food and water, illegal deductions from their pay, confiscation of passports, and failure to procure promised visa extensions, knowing that these threats caused the Claimants to believe that, if they were sent back to Thailand, they and their families would suffer serious harm, including the risk of destitution, shame, and loss of family homes and subsistence lands, as a result of debts incurred to pay the recruitment fees charged.

90.    Orian confirmed that Global withheld federal and state income taxes from the Claimants.

91.     Orian admitted that he became aware of AACO and K.S. charging recruiting fees to the Thai workers.  Orian admitted that in 2005 he became aware

First Amended Complaint - 15

that the Claimants were complaining about recruitment fees substantially higher than acknowledged by Global's recruiting companies in Thailand.  As a result, Orian Global sent an ACCO representative to meet in with the Claimants.  However, the ACCO representative threatened the Claimants and/or demanded more fees.

92.    Tubchumpol confirmed that in 2004 the Claimants complained about paying recruitment fees substantially higher than stated in the employment contracts prepared in Thailand.  Tubchumpol discussed the discrepancy with ACCO's owner Chunharutai, but failed to take proper action to correct the problem.

93.    Schwartz also heard that Claimants complained about recruitment fees of $10,000-$20,000.  But Schwartz simply dismissed the complaints.

94.    Tubchumpol admitted that when she met with the Claimants they complained that there was not enough work but that Global's Thai recruiters asked for additional money in order to stay in the United States and continue working.

95.    Numerous state and federal investigations found that Global violated various requirements which perpetuated and exacerbated the hostile work environment and discrimination against the Claimants.

96.    In March and April 2006, the Hawaii Department of Labor and Industrial Relations' Occupational Safety and Health Division ("HDLIR") conducted inspections of various farms camps in Hawaii that employed temporary migrant farm workers.  The inspection of Global's camps resulted in citations for multiple violations ranging from unsafe living conditions to inadequate safety and health management systems.  Violations for unsafe living conditions included insufficient living space, beds too close in proximity, and exposure to electrical and fire hazards.

97.    Global failed to provide workers' compensation coverage to its H-2A workers working in Hawaii in 2006.  As a result, the HDLIR ordered Global to

First Amended Complaint - 16

discontinue operations in Hawaii effective June 26, 2006, and notified one or more Hawaii farms, including but not limited to Kelena Farms in July 2006.

98.    The U.S. Department of Labor found that Global improperly deducted $75 from the paychecks of some of workers for damage allegedly done to housing; improperly deducted for food $42 per week from the Claimants who worked at Maui Pineapple; failed to offer sufficient hours of work; improperly withheld federal income tax from the workers' paychecks; failed to pay the required overtime compensation to the workers.

99.    On or about July 27, 2006, the U.S. Department of Labor issued a Notice of Prospective Denial of Temporary Alien Agricultural Labor Certification to Global for three years.  According to this Notice,

> An investigation of [Global's] operations relating to the employment of agricultural workers has disclosed multiple substantial violations in California for the H-2A labor certification application that covered the period from August 1, 2003 to April 30, 2004, under the Immigration and Nationality Act (INA), as amended by the Immigration Reform and Control Act (IRCA) (8 U.S.C. §§ 1101(a)(15)(H)(ii)(a), 1184(c) & 1186), and under the implementing regulations for these Acts.  As a result of this investigation and pursuant to 20 C.F.R. § 655.110(a), the Office of Foreign Labor Certification in the employment and Training Administration (ETA) has determined that any H-2A labor certification application filed by either Global Horizons Manpower, Inc. also as known as Global Horizons, Inc. (Global) or Mordechai Orian (Orian) will be denied for the next three years. I have concluded that Global and/or Orian made fraudulent and/or willful misrepresentations with respect to their labor certification application and that these actions constitute a "substantial violation" as defined in 20 C.F.R. §655.110(g)(1)(i)(E). More specifically:

First Amended Complaint - 17

- Global and Orian knowingly provided false information regarding agricultural work to be performed in California under the labor certification application requested for the August 1, 2003 to April 30, 2004, time period. This application sought certification for 200 workers, when neither the agricultural work nor the contractual relationship with Taft Vegetable Farms, which was the basis for the application, ever existed.

- Global and Orian also knowingly provided false information regarding the termination of the employment of U.S. workers. They represented to government agencies that the employment of U.S. workers was terminated for poor performance, when, in fact, the workers were terminated for reasons other than for cause.

100. On November 30, 2006, a U.S. Department of Labor Administrative Law Judge made the July 27, 2006 Notice of Debarment final.

101. The foregoing as well as other investigations, citations, and findings gave Global and the Farm Defendants ample opportunity to prevent and correct the alleged discrimination and hostile work environment.

### Farm-Defendants had Access to Basic Information Regarding the H2-A Program Requirements from the DOL's Website

102. The U.S. Department of Labor's website summarizes the H2-A worker program as:

> The Immigration and Nationality Act (INA) authorizes the lawful admission into the United States of temporary, nonimmigrant alien workers to perform agricultural labor or services that are temporary or seasonal in nature. . . . Employers of such workers and U.S. workers who perform work covered by the job order or contract are obligated to comply with the terms and conditions specified in the job order/contract, and all applicable statutory and regulatory requirements.

First Amended Complaint - 18

103.   The U.S. Department of Labor requires that each H2-A worker be provided a copy of a work contract or job clearance order:

> Every worker must be provided a copy of the worker contract or, as a substitute for the worker contract, a copy of the job clearance order. If worker contracts are provided, they must specify at least those benefits required by the job order and DOL Regulations. The job clearance order is the "official" document since it is the one submitted by the employer and approved by DOL. The job clearance order/contract must state:
>
> - the beginning and ending dates of the contract period
> - any and all significant conditions of employment -- such as payment for transportation expenses incurred, housing and meals to be provided (and related charges), specific days workers are not required to work (i.e., Sabbath, Federal holidays)
> - the hours per day and the days per week each worker will be expected to work during the contract period
> - the crop(s) to be worked and/or each job to be performed
> - the applicable rate(s) of pay for each crop/job
> - any tools required and that the employer pays for same
> - that workers' compensation insurance will be provided per State law of the State where work is performed

104.   The U.S. Department of Labor's website summarized the housing requirements as follows:

> Housing that meets the applicable substantive health and safety requirements, both prior to and throughout the

First Amended Complaint - 19

period of occupancy, must be provided at no cost to covered workers.

**105.** When the Claimants complained of the unlawful employment practices alleged in the above paragraphs as to Global, and paragraphs below as to allegations pertaining to the Farm-Defendants and Global, Global took adverse employment actions against the Claimants including without limitation threatening the Claimants with deportation, arrest, suspension, and/or physical violence; Global subjected the Claimants to harassment, significant gaps in work, visa and certification violations, suspension, deportation, and/or physical violence at the hands a Global supervisor; and Global subjected the Claimants to intolerable working conditions that resulted in constructive discharge.

### Global Provided Guidance About Compliance with the H2-A Program.

106.    Global was aware of the H2-A program requirements and may have provided guidance to some of the Farm-Defendants the "H-2A COMPLIANCE REVIEW CHECKLIST."  Both Global and the Farm Defendants failure to comply with the H2-A program also contributed to the creation of a hostile work environment and disparate treatment of the Claimants in violation of Title VII.

107.    The "H-2A COMPLIANCE REVIEW CHECKLIST" provided the following:

ARE YOU AWARE:

THAT THE FOREIGN H2-A WORKERS CAN WORK:

- ONLY FOR YOU?
- ONLY AT THE LOCATION(S) NAMED?
- ONLY DURING THE STATED TIME PERIOD?
- THAT GLOBAL MUST HIRE ALL U.S. JOB APPLICANTS REFERRED TO IT WHO ARE READY, WILLING AND ABLE TO PERFORM THE JOB

First Amended Complaint - 20

DURING THE FIRST 50% OF THE CONTRACT PERIOD?

- THAT ALL U.S. WORKERS DOING THE SAME JOB AS H2-A WORKERS (CORRESPONDING EMPLOYMENT ) ARE ENTITLED TO ALL THE RIGHTS AND PROTECTIONS OF THE CONTRACT?
- THAT IF A WORKER ABANDONS EMPLOYMENT, YOU MUST IMMEDIATELY INFORM GLOBAL SO THAT IT COULD CONTACT THE LOCAL JOB SERVICE SO THERE IS AN OPPORTUNITY TO INVESTIGATE THE CIRCUMSTANCES OF THE ABANDONMENT OR TO REFER QUALIFIED U.S. WORKERS TO FILL JOB OPENINGS?
- THAT WORKERS WHO COMPLETE THE SEASON OR ARE TERMINATED WITHOUT SUFFICIENT CAUSE MUST BE PAID THEIR RETURN TRANSPORTATION AND FULL ¾ GUARANTEE?

ONCE EMPLOYMENT OF U.S. WORKERS IN CORRESPONDING EMPLOYMENT, OR EMPLOYMENT OF H2-A WORKERS COMMENCES, DO YOU KNOW THAT H2-A EMPLOYER MUST:

1. PROVIDE THE WORK CONTRACT OR JOB ORDER (FORM ETA-790) TO EACH WORKER (FOREIGN OR U.S. WORKER IN CORRESPONDING EMPLOYMENT) BY THE FIRST WORKDAY?
2. KEEP ALL REQUIRED PAYROLL RECORDS?
3. PROVIDE REQUIRED WAGE STASTEMENT TO WORKER ON OR BEFORE EACH PAYDAY?
4. PAY ALL WAGES DUE ON THE DISCLOSED PAYDAY?
5. PAY THE CORRECT WAGE RATE EACH PAYDAY? THAT RATE IS THE HIGHEST OF THE AEWR, STATE OR FEDERAL MINIMUM WAGE, PREVAILING WAGE, OR PROMISED WAGE, INCLUDING PIECE-RATES.
6. GUARANTEE PAYMENT FOR ¾ OF THE WORK HOURS IN THE CONTRACT PERIOD?

7. MAKE ALL LEGALLY REQUIRED PAYROLL DEDUCTIONS AND NOT MAKE DEDUCTIONS PROHIBITED BY LAW OR NOT DISCLOSED IN WORKER CONTRACT?

8. GLOBAL OR CLIENT MUST PROVIDE HOUSING TO ALL WORKERS UNDER THE CONTRACT (U.S. WORKERS IN CORRESPONDING EMPLOYMENT AND H2-A WORKERS) WHO CANNOT REASONABLY RETURN TO THEIR PERMANENT HOME AT NIGHT? AND

   B. ENSURE THE HOUSING REMAINS IN COMPLIANCE WITH APPLICABLE SAFETY AND HEALTH STANDARDS?

9. GLOBAL OR CLIENT MUST PROVIDE HOUSING DESCRIBED IN #8 FREE OF CHARGE FOR RENT OR DEPOSITS TO ALL WORKERS?

10. GLOBAL OR CLIENT MUST PAY THE COST OF TRANSPORTATION AND SUBSISTENCE, TO YOUR FARM, FROM WHERE EACH U.S. OR FOREIGN WORKER AS RECRUITED WHEN THE WORKER COMPLETES 50% OF THE CONTRACT?

    B. PROVIDE DAILY TRANSPORTATION FROM THE HOUSING TO THE WORK SITE AT NOT COST?

    C. AT THE END OF THE CONTRACT PERIOD, PAY FOR THE WORKER'S RETURN TRANSPORTATION AND SUBSISTENCE TO "THE PLACE FROM WHICH HE CAME", USUALLY HIS OR HER HOME?

11. GLOBAL OR THE CLIENT MUST ENSURE THAT VEHICLES USED TO TRANSPORT U.S. OR H2-A WORKERS MEET FEDERAL, STATE AND LOCAL SAFETY REQUIREMENTS?

12. GLOBAL OR CLIENT MUST PROVIDE THREE MEALS PER DAY AT COST OR FREE CENTRALIZED COOKING FACILITIES FOR THE WORKERS?

13. GLOBAL OR CLIENT MUST PROVIDE NECESSARY TOOLS, SUPPLIES AND EQUIPMENT AT NO COST TO THE WORKER?

First Amended Complaint - 22

14. PROVIDE WORKER'S COMPENSATION INSURANCE (OR ITS EQUIVALENT IF WORKERS ARE EXCLUDED FROM STATE WORKERS COMPENSATION) AT NO COST TO THE WORKER?

15. IN CASE OF CONTRACT IMPOSSIBILITY ("ACT OF GOD") THAT REQUIRES TERMINATION OF EMPLOYMENT PRIOR TO THE END OF THE CONGTRACT PERIOD, PROVIDE REMAINING CONTRACT BENEFITS, INCLUDING PAYMNENT OF ¾ GUARANTEE OBLIGATIONS (UP TO TIME OF THE EVENT WHICH TERMINATED THE EMPLOYMENT ) AND RETURN TRANSPORTATION/SUBSISTENCE?

16. GLOBAL MUST AVOID REJECTING OR TERMINATING U.S. WORKERS OTHER THAN FOR LAWFUL JOB-RELATED REASONS? AND MUST B. NOTIFY THE LOCAL JOB SERVICE OFFICE OF ALL REJECTIONS, TERMINATIONS AND RESIGNATIONS OF U.S. AND/OR FOREIGN WORKER?

17. PROVIDE U.S. WORKERS EMPLOYED IN OR APPLYING FOR CORRESPONDING EMPLOYMENT WAGES, BENEFITS, AND WORKING CONDITIONS AT LEAST EQUAL TO THOSE PROVIDED TO FOREIGN WORKERS?

18. AVOID DISCRIMINATION AGAINST WORKERS WHO TESTIFY OR OTHERWISE EXERCISE THEIR RIGHTS?

19. AVOID CAUSING WORKERS TO WAIVE THEIR RIGHTS?

20. PERMIT DOL INVESTIGATIOSN OF YOUR BUSINESS?

21. AVOID INTERFERING WITH DOL OFFICALS WHO INVESTIGATE YOUR BUSINESS ACTIVITIES?

22. AVOID PROVIDING FALSE INFORMATION TO DOL OFFICIALS?

23. MAKE RECORDS AVAILABLE TO DOL, THE WORKER OR THE WORKER'S REPRESENTATIVE?

First Amended Complaint - 23

24.    COMPLY WITH ALL FEDERAL, STATE AND LOCAL EMPLOYMENT-RELATED LAWS AND REGULATIONS?

25.    COMPLY WITH THE FAIR LABOR STANDARDS ACT?

26.    IF YOU EMPLOY U.S. WORKERS, COMPLY WITH THE MIGRANT AND SEASONAL AGRICULTURAL WORKER PROTECTION ACT?

THIS IS ONE OF A SERIES OF COMPLIANCE ASSISTANCE FACT SHEETS HIGHLIGHTING U.S. DEPARTMENT OF LABOR PROGRAMS. IT IS INTENDED AS A GENERAL DESCRIPTION ONLY AND DOES NOT CARRY THE FORCE OF LEGAL OPINION.[1]

108. Farm-Defendants likely knew or should have known of minimum housing standards applicable to farms using H2-A workers, but the Farm-Defendants improperly delegated that responsibility to Global.

109. Farm-Defendants knew or should have known of the H2-A program requirements in that the above guidance provided an opportunity to investigate the requirements. Compliance with the H2-A program requirements should have given all Farm-Defendants an opportunity to prevent and correct the discrimination and hostile work environment alleged in this action.

//
//
//
//
//

---

1    Original typographical errors not corrected.

First Amended Complaint - 24

### *State and Federal Investigations Revealed the Mistreatment of the Claimants*

110.    Numerous state and federal investigations found that Global violated various state and federal laws, and perpetuated and/or exacerbated the hostile work environment and discrimination against the Claimants.

111.    Global had acted as a Farm Labor Contractor in early 2004 but had failed to obtain a Washington Farm Labor License.

112.    Global was assessed penalties and citations for its improper housing arrangements for the Thai workers in Washington in or about August, October, and December 2004.

113.    The State of Washington issued notices to Global detailing the violation and assessing penalties in or about May and June 2005.

114.    The State of Washington Employment Security Department's ("ESD") May 10, 2005 Notice of Discontinuation of Employment Services to Global for the following reasons:

**A. Misrepresentation As To Terms and Conditions of Employment or Failure to Comply Fully With Assurances Made on Job Orders Pursuant to 20 CFR 658.501(a)(3)**

    1.    <u>Housing Misrepresentations</u>

        …

        [T]hese sites were inspected by the Department of Health on August 3, 2004 and the Washington State Department of Labor and Industries on October 27, 2004, and found to be substandard.  The regional representative for Global Horizons acknowledged that the company failed to provide the promised accommodations.

    2.    <u>Improper Pay</u>

        You deducted Washington state income tax from … workers' pay.  Washington has no such tax.…

    3.    <u>Failure To Comply With State Law For the Protection Of Workers</u>

        ...

First Amended Complaint - 25

4.    Failure to Secure A State Farm Labor Contractor's License
Pursuant to RCW 19.30.020
[G]lobal did not have such a license when it filed H-2A
applications on December 4, 2003, December 28, 2003, March
4, 2004, June 10, 2004, June 25, 2004, and September 3, 2004.
You secured a state farm labor contractor's license on October
7, 2004.  Renewal of this license was denied on December 30,
2004 because various violations of state law.  The license
secured on February 17, 2005 is in effect only through June 30,
2005.  The period of employment pursuant to your latest
request extends beyond June 2005.

5.    Job Duties,
...

6.    Wrongfully applying productivity standards that were not
contained in the H2-A application on job order WA#1332740,
submitted on January 20, 2005
...

**B. Failure to recruit U.S. Workers In Accordance With 20 CFR
658.501(a)(6)**
...

### *Farm-Defendants' Possible Violations of the H2-A Program*

115.    Green Acre knew or should have known Global sought and obtained
approval from the U.S. Department of Labor ("DOL") for approximately 131 H-
2A workers to be employed at Green Acre from March 2004 until November 5,
2004.

116.    Valley Fruit knew or should have known that Global sought and
obtained approval from DOL for approximately 62 H-2A workers to be employed
at Valley Fruit from August 2004 until October 31, 2004.

117.    Farm-Defendants knew that some of the Claimants started working in
the State of Washington at Green Acre and/or Valley Fruit in the spring/summer of
2004, before the clearance orders were approved and before Global obtained a
farm labor contractor license in the State of Washington.

First Amended Complaint - 26

118.   Farm-Defendants knew or should have known that that they were in violation of the H2-A program because some of the Thai workers were transported to work in other farms, including farms in Hawaii, even though the H-2A clearance orders were approved for Washington because the clearance orders stated that they were going to be assigned to work at Green Acre and/or Valley Fruit but they were never assigned to these farms.

119.   Farm-Defendants knew or should have known that they were in violation of the H2-A program because the Farm-defendants did not differentiate as to whether the Claimants were assigned to work for Green Acre and/or Valley Fruit and the Claimants were constantly being transferred from Green Acre and/or Valley Fruit.

### ALLEGATIONS PERTAINING TO GREEN ACRE
#### Green Acre Retained Control Over the Claimants

120.   Green Acre executed at least two contracts for Global to provide H2-A workers at Green Acre.  The first Farm Labor Contract H2-A Agreement was entered into on or about December 15, 2003 and was effective February 2, 2004 through November 5, 2004.   The second Contract was effective from on or about January 10, 2005 through November 10, 2005.

121.   The Contracts between Green Acre, the "Client," and Global, the Farm Labor Contractor ("FLC") gave Green Acre day-to-day control over the work to be performed by the Claimants by stating "[C]LIENT shall advise FLC of the Services that must be performed on a day-to-day basis, as well as those portions of the Land to be worked by FLC.  CLIENT shall determine the number of its employees that will be required to accomplish the Services and notify FLC of said number."  The Contracts also gave Green Acre the right to have a representative present at all times to ensure quality.

First Amended Complaint - 27

*Green Acre's Management Controlled the Terms and Conditions of the Claimants' Employment*

122.    Green Acre controlled the Claimants' jobs by supervising them, showing them how to conduct the work, inspecting their work, and providing the equipment. Green Acre also set the time and location of work of the Claimants

123.    Green Acre's Co-owner Jim Morford confirmed that Green Acres would tell Global's supervisor Bruce Schwartz or one of the Thai workers' crew leaders how to do the job correctly.

124.    Green Acre's personnel, including management personnel such as Co-owner Jim Morford, instructed on a daily basis the Thai Claimants who were crew leaders as to the particular locations where fruits should be picked by the Thai workers; and how to fill out forms at the end of the day showing how much each Thai worker picked, how many workers picked fruits, and how many hours were worked.

125.    Green Acre's personnel trained the Thai Claimants as to how to do their work, including how to pick fruits, how to trim the branches, how to move the boxes containing the fruits, and how to climb and carry the ladder to pick fruits.

126.    Green Acre's personnel inspected the work by the Thai Claimants on a daily basis to ensure that they were picking fruits correctly and quickly enough.

127.    Green Acre's personnel also disciplined the Thai Claimants during their employment at Green Acre.  When the Green Acre's personnel believed that the work was not done property, they yelled at the Thai crew leaders and the Thai workers themselves.  The Green Acre's personnel also disciplined the Thai Claimants by sending them home, by not giving them work for several days, and by firing some of them.

128.    Green Acre also provided the equipment to the Thai Claimants for them to do their job at Green Acre.  The equipment provided included the baskets, bags, buckets, bins, knives, scissors, and trimmers.

First Amended Complaint - 28

*Green Acre Engaged in the Discriminatory Conduct or Had Actual and/or Constructive Knowledge of Global's Discrimination*

129.   Green Acre directly engaged in the discriminatory conduct or knew or should have known of any discriminatory practices committed by Global against the Claimants.

130.   Green Acre's Co-owner Jim Morford knew or should have known that that Global targeted Thai workers, who were targeted due to the stereotype that they would be compliant and would not try to escape. Through its contracts to recruit workers through the H-2A program, Global recruited Thai workers, who worked at Green Acres. Global also told Green Acre's Co-owner Jim Morford that it was recruiting workers for Green Acre from Thailand.

131.   Green Acre directly engaged in or knew or should have known of the deplorable working conditions suffered by the Claimants since Green Acre along with Global controlled the Claimants' employment and working conditions.

132.   Green Acre knew or should have known of the bad living conditions because some of the Claimants complained directly to Green Acre's personnel, including Green Acre's Co-owner Jim Morford.  Such knowledge should have prompted Green Acre to investigate Global and would have revealed of additional discriminatory practices committed by Global.

133.   Green Acre, including Co-owner Jim Morford, knew or should have known as early as July 2004 that Global did not have a farm labor contractor license. Such knowledge should have prompted Green Acre to investigate Global and would have revealed its discriminatory practices towards the Claimants. Instead, Green Acre continued use Global's services until the first contract expired after November 2004, and entered into a second Contract with Global in 2005.

134.   Green Acre knew or should have known that Global was under state and federal investigations and were assessed penalties for violating state and

First Amended Complaint - 29

federal law.  Such knowledge should have prompted Green to investigate Global and would have revealed its discriminatory practices towards the Claimants, including, but not limited to the substandard housing and/or bad living conditions, at the following locations, which were listed on the Claimants' clearance orders:

      a.  Qual Ridge Apartments, 1500 West Mead Avenue, Yakima, WA: 100 Occupants;

      b.  Mead Manor Apartments, 1502 South 10th Avenue and 1006 West Mead Avenue, Yakima, WA: 61 Occupants;

      c.  313 North 6th Avenue, Yakima, WA: 25 Occupants;

      d.  Canyon Park Apartments, Canyon Drive, Prosser: 49 Occupants.

      e.  Metaline West Apartments; Metaline Street, Kennewick, WA: 50 Occupants;

      f.  1671 Houhgton Road, Zillah, WA: 19 Occupants;

      g.  381 Buena Loop Road, Zillah, WA: 16 Occupants;

      h.  9386 Road "G", Royal City, WA: 32 Occupants.

### *Race/National Origin Discrimination at Green Acre*

135.  The Claimants belong to a protected class (Thai/Asian), the Claimants were qualified to do the work and they performed their jobs satisfactorily, the Claimants suffered adverse employment actions by being subject to adverse terms and conditions as described above and below, and similarly situated individuals outside the protected class were treated more favorably, or other circumstances surrounding the adverse employment actions giving rise to an inference of discrimination including but not limited to a hostile environment.

### *Adverse Terms and Conditions with Respect to Housing at Green Acre*

136.  The Claimants were subject to adverse terms and conditions with respect to the uninhabitable and/or substandard living conditions while working at Green Acre.  The non-Thai workers, including but not limited to the Mexicans workers, were not subjected to the same uninhabitable and/or substandard living conditions as the Thai workers while working at Green Acre.

First Amended Complaint - 30

137.   The Claimants were required to live in overcrowded hotels with approximately three to seven Thai workers per hotel room during the time they worked at Green Acre.  Some of the Claimants had to sleep on the floor due to the overcrowding.  Some of the Claimants had to cook on the bedroom floor, in the bathroom, or outside because there was no kitchen in the hotel room.  Some of the Claimants ate on the floor because there was no kitchen table or chairs. Some of the Claimants also had to go through people's trash looking for beds, mattresses, and kitchen equipment to use.  Some of the Claimants had to take showers using the water hose outside or to go outside to urinate because of inadequate bathroom facilities.  Because of the lack of laundry facilities, some of the Claimants had to wash their clothes in the sink or bathtub and hang their clothes outside during the time they lived at the hotels.  There were problems with mice, roaches, and insects in some of the houses.

138.   Some of the Claimants did not have sufficient food to eat partly due to delays in getting them to grocery stores to replenish their supplies.  When they ran out of the food, some of the Claimants ate wild vegetables (wild spinach), and would fish in order to eat.  Other Claimants had to kill rabbits or birds to eat when they would run out of food.

139.   Some of the Claimants lived in substandard places, including the hotel located at 1700 N.1st St., Yakima, WA 98901, the Corral Motel located at 1731, Hwy. 97, Toppenish, WA  98948, the Top Tennis Hotel, 381 Buena Loop Rd., Zillah, WA, Mabton Apartment Building, 204 N. Main, Mabton, Washington, 98935, and housing near a river or Moses Lake.

140.   The Claimants were also subjected to unsafe and overcrowded transportation from the housing to the farm during the time they worked at Green Acre.  The Claimants were packed in the bus and they would have to sit in the middle of the bus or they had to sit on each others laps because there were not

First Amended Complaint - 31

enough seats. Claimant KA complained about the unsafe and overcrowded transportation but not corrective action was taken.

### *Improper Deductions, Denial and/or Delay of Pay, and/or Long Periods of No Work at Green Acre*

141.   The Claimants were subject to improper deductions, denial and/or delay of payment of wages for work performed, and long periods of no work at Green Acre.  The non-Thai workers, including, but not limited to the Mexicans workers, were not subjected to improper deductions, denial and/or delay of pay, and long periods of no work at Green Acre. Even a visit to the doctor warranted a deduction in a Claimant's paycheck.

142.   While working at Green Acre, the Claimants were subjected to improper deductions such as Washington State income tax while working at Green Acre.

143.   Some Claimants were told that money was deducted from their paychecks to be sent to their families in Thailand, but their families never received the money.  When Claimant SF complained to Global's supervisor Pranee Tubchumpol as to why his family had not received the money deducted from his paychecks, she said she didn't have anything to do with it and no one followed up with him.

144.   Multiple check stubs reflected a check amount of $0 being paid to Claimants who worked at Green Acre.

145.   The Claimants' pay was often late while working at Green Acre.

146.   Contrary to promises of abundant work made when recruited, the Claimants were subject to long periods of no work and no pay while working at Green Acre.  Claimant PW had to wait for a month without any work.  Claimant SU had no work for one month.  Claimant UW did not have any work for a three week period.  Some of the Claimants only worked one or two hours or only

First Amended Complaint - 32

worked two or three days per week.  Because of the lack of work, some of the Claimants were sent back to Thailand after working for a few months because there was not enough work at Green Acre.

### *Different Terms and Conditions at Green Acre*

147.   The Claimants were subject to adverse terms and conditions because the non-Thai workers, including the Mexican workers, were treated more favorably than the Thai workers at Green Acre.

148.   The Mexican workers were given a break every two hours, and the Claimants had to work fours straight and then take a break.

149.   The Mexican workers received priority over the Claimants when work was slow and/or there was not enough work at Green Acre. Charlie Blevins would tell the Claimants not to work, and let the Mexican workers work when there was not enough work at Green Acre.

150.    The Claimants had to do the more difficult work such as trimming the trees, while the Mexican workers only had to tie the string on the trees.  The Mexican workers were able to pick the larger apples first and leave the smaller apples for the Claimants, which were harder to pick.

151.   According to Claimant SN, the Thai workers had to leave whenever they were told to leave the farm whereas the Mexican workers left whenever they wanted to leave. Claimant KP confirmed the Mexican workers would be able to leave when it rained whereas the Claimants had to continue working in the rain at Green Acre.

### *Restrictions on the Claimants' Movements at Green Acre*

152.   The Claimants were unable to leave the premises and their movements were restricted while working at Green Acre.  The Claimants were forbidden from going out or leaving the housing by themselves or without a Global supervisor. The non-Thai workers, including but not limited to the Mexicans workers, were

First Amended Complaint - 33

able to leave the premises and their movements were not restricted while working at Green Acre.

153.   The Claimants were subject to a curfew during the time they worked at Green Acre.

154.   A number of Claimants were threatened and told not leave the housing, not to contact relatives, outsiders, or government agencies or they would be sent back to Thailand.  Global's supervisors Charlie Blevins, Pranee Tubchumpol, and crew leaders threatened the Claimants numerous times, telling the Claimants that if they did not obey the rules, they would be deported.   They also told the Claimants to keep quiet and not associate with outsiders.

155.   Detention guards monitored the Claimants at the hotel during the time they worked at Green Acre. The detention guards carried batons and hand cuffs, and were stationed at the hotel all day and all night.  Claimant PW confirmed that detention guards secured the hotel's exits, and the guards followed the Thai workers on the hotel grounds.  Claimant PH confirmed that the detention guards at the hotel monitored their movements, and that the Thai workers were subjected to twice daily roll calls to make sure that the Thai workers were there.

156.   Global's Supervisor Sam told the Claimants they were not to socialize with other people and not to talk to other people, and he prohibited them from going out.  Sam frequently told the Claimants that they were not allowed to use the phone and that they could not leave their rooms unless it was to go to work. Sam said if anyone dared to leave their rooms, that person would be sent back to Thailand.  According to Claimant PH, Global's Supervisor Sam saw some Thai workers socialize with people outside of their group, and the socializing Thai workers were sent back to Thailand and were not allowed to come back.

157.   Global's Supervisor Charlie Blevins walked around the housing with a shotgun and dogs; and shot birds to intimidate the Thai workers.

First Amended Complaint - 34

158.    Global's Supervisor Pranee Tubchumpol threatened a group of Thai workers that if one worker ran away she would deport all 28 of them.  When a U.S. Department of Labor officer came to the fields, Pranee Tubchumpol told the Thai workers a few days later not to talk to any outsiders.

159.    Global's Supervisor Bruce Schwartz also threatened that if someone tried to escape, he would deport the whole group back to Thailand.

160.    Global's Orian, Charlie Blevins, Pranee Tubchumpol, and the crew leader met with the Thai workers in Moses Lake, Washington and Orian said, "Anyone who does not obey the rules, will be sent back home."

161.    On one occasion, Claimant AK was going to the store when Global's Supervisor Shane Germann followed him and told him to go back to the house, and threatened to send him back to Thailand.

### *Additional Harassment at Green Acre*

162.    The Claimants were subjected to verbal or physical conduct (including but not limited to abusive language, exorbitant and/or unlawful recruitment fees, confiscation of passports, uninhabitable housing, insufficient food, inadequate pay, demeaning job assignments, and threats and intimidation) based on their national origin and/or race, the conduct was unwelcome, and the conduct was sufficiently severe or pervasive to alter the conditions of the Claimants' employment and create an abusive working environment.  Further, the working conditions had become so intolerable that the Claimants felt compelled to escape and thereby were constructively discharged.

163.    Global's supervisors and crew leaders harassed and/or threatened the Claimants in order to meet the quotas, which were set by Green Acre.

164.    Global's supervisors, such as Pranee, threatened the Thai Claimants with not being hired again or with being sent back to Thailand if the quotas were not met.

First Amended Complaint - 35

165.    At Green Acre, Global's Supervisor Sam yelled at Claimant JC and the Thai workers, and called them degrading names and pressured them to work faster and harder.  Global's Supervisor Sam told the Thai workers that they had to work faster because Green Acre was not satisfied.

166.    Claimant PR confirmed that Global's supervisor would yell at the Claimants to worker faster because the Mexican workers worked fast.

167.    The Claimants' crew leaders also told the Claimants that the Mexican workers work better than them and constantly demanded the Claimants to increase the production.

### *Retaliation at Green Acre*

168.  Some of the Claimants, including, but not limited to SP, JS, DP, KA, and KT, complained directly to Green Acre's personnel, including Green Acre's Co-owner Jim Morford, about the bad living conditions and working conditions while working at Green Acre.  The Claimants also complained to Global's supervisors including Pranee Tubchumpol, Sam, and Bruce Schwartz.  The Claimants complained about their deplorable living conditions, about their less favorable treatment as compared to the Mexican workers, their harsh working conditions, unpaid and late wages, and their lack of work at Green Acre.  Corrective actions were not taken.

169.  Shortly after the complaints, the Claimants were subject to threats of deportation or harsher treatment, higher demands of production, reduced work assignments, or even transfer to other farms in other states.

### *Green Acre's Pattern or Practice/Standard Operating Procedure*

170.    Seventy-one Claimants filed Charges of Discrimination against Green Acre.  CP Laphit Khadthan's charge was dually filed with the EEOC and the Washington State Human Rights Commission.  According to the worksharing agreement between the Washington State Human Rights Commission ("FEPA") and the EEOC, each designate the other as its agent for the purpose of receiving

First Amended Complaint - 36

and drafting charges.  The EEOC's receipt of charges on the FEPA's behalf will automatically initiate the proceedings of both EEOC and FEPA.

171.    Plaintiff EEOC incorporates by reference, all of the foregoing paragraphs which reflect that a pattern and practice of participating in or allowing discrimination, harassment, retaliation, and/or constructive discharge persisted at Green Acre for the durations of its contracts with Global from 2004 through 2005. Based on information and belief, there were approximately 87 Claimants working at Green Acre from 2004 through 2005 before and during the contract periods.

### ALLEGATIONS PERTAINING TO VALLEY FRUIT
#### Valley Fruit Retained Control Over the Claimants

172.    Valley Fruit executed at least two contracts for Global to provide H2-A workers at Valley Fruit.  The first Farm Labor Contract H2-A Agreement was effective on or about February 2, 2004 through November 5, 2004.  The second Contract was entered into on January 4, 2005 and was effective from January 1, 2005 through November 1, 2005.

173.    The Contracts between Valley Fruit, the "Client," and Global, the Farm Labor Contractor ("FLC"), gave Valley Fruit day-to-day control over the work to be performed by the Claimants by stating "[C]LIENT shall advise FLC of the Services that must be performed on a day-to-day basis, as well as those portions of the Land to be worked by FLC.  CLIENT shall determine the number of its employees that will be required to accomplish the Services and notify FLC of said number."  The Contracts also gave Valley Fruit the right to have a representative present at all times to ensure quality.

First Amended Complaint - 37

*Valley Fruit's Management Controlled the Terms and Conditions of the Claimants' Employment*

174.   Valley Fruit controlled the Claimants' jobs by supervising them, showing them how to conduct the work, making the work assignments, evaluating their work, and providing the equipment.

175.   Valley Fruit's Co-owner John M. Verbrugge confirmed that Valley Fruit supervisors directed the Claimants where to pick, what to pick, and how to pick it with the crew leaders.

176. Valley Fruit's Co-owner John M. Verbrugge admitted telling his employees, "[I] told them to watch the crew as a whole to watch their efficiencies and quality of production that they were doing, and discuss with the crew bosses, either Jose Cuevas, and for example, the Thai workers had their own Thai interpreter..."

177. Valley Fruit's Co-owner John M. Verbrugge admitted that the Claimants were not efficient or fast enough so he told his manager at Royal City, Dirk Dunn, to try to work with their crew leaders to get them to understand how to thin trees more efficiently.

178. Valley Fruit's Co-owner John M. Verbrugge admitted that his managers were working with the crew bosses and Jose Cuevas on a daily bases to get them to understand how to be more efficient.

179.  Valley Fruit's Co-owner John M. Verbrugge admitted that Valley Fruit provided the Thai workers with the tools and equipment such as the picking buckets that they would dump the fruit in.  Verbrugge said, "[B]ut they -- as far as like picking, we provided the buckets and we provided the materials that they are supposed to go into the bins or the lugs that we picked into...If they did any tree training, we would provide training tools necessary for them to get the job done correctly...And if there was any holes that they were digging or anything, they

First Amended Complaint - 38

would need a shovel. We would provided that if we had those tools available. And ladders also."

180. The Claimants confirmed that Valley Fruit's personnel supervised their work and told them what to do, and that Valley Fruit's personnel disciplined the Thai workers by not allowing them to work if they did not pick the apples properly.

181. The Claimants confirmed that the crew leaders received instructions and orders from Valley Fruit's personnel on a daily basis before telling them what to do.

182. The Claimants confirmed that Valley Fruit's employees would drive motorcycle carts around and would check up on the Claimants' work.

183. Valley Fruit's personnel showed the Claimants how to conduct the work.  Claimant DK confirmed that Valley Fruit's employees trained the Claimants by showing them how to pick the right fruit. Claimant CA confirmed that Valley Fruit's employees would show the Claimants how to put the bags on, how to pick the apples, how to set up the ladders, and how to pour the apples.

184. Claimant SS confirmed that Valley Fruit's employees trained the Claimants, and that Valley Fruit's employees would also tell them how much they needed to pick, and would watch over them on a daily basis.  Valley Fruit's supervisor would critique the Claimants' work and would tell their crew leader how they were doing.

185. According to Claimant DK, it was Valley Fruit's personnel who told the Claimants when they could take a break, and Valley Fruit's personnel would sometimes complain that what the Thai workers picked was not good enough.

186. According to Claimant UW, Valley Fruit's personnel would come visit the Thai workers often while they were picking apples and other fruit in the orchards, and would talk to crew leaders. Valley Fruit's personnel sometimes used

First Amended Complaint - 39

1  the crew leaders to interpret, but also communicated with the Claimants using hand
2  gestures and other non-verbal methods of communication.

3

4  ***Valley Fruit Engaged in the Discriminatory Conduct or Had Actual and/or***
5  ***Constructive Knowledge of Global's Discrimination***

6  187.   Valley Fruit directly engaged in the discriminatory conduct or knew
7  or should have known of any discriminatory practices committed by Global against
8  the Claimants.

9  188.  Valley Fruit knew or should have known that Global recruited Thai
10  workers, who were targeted due to the stereotype that they would be compliant and
11  would not try to escape.  Through its contracts to recruit workers through the H-2A
12  program, Global recruited Thai workers, who worked at Valley Fruit.

13  189.  Valley Fruit directly engaged in or knew or should have known of the
14  deplorable working conditions suffered by the Claimants since Valley Fruit along
15  with Global controlled the Claimants' employment and working conditions.

16  190.  Valley Fruit knew or should have known of the discrimination because
17  some of the Claimants complained directly to Valley Fruit's personnel that they
18  needed to work more hours because they had so much debt at home. Valley Fruit's
19  response was that the Claimants had to continue working according to the work
20  schedule set by the farm. Valley Fruit had an opportunity to prevent and correct the
21  discrimination and hostile work environment alleged in this action but it failed to
22  take action.

23  191.  Valley Fruit, including its Co-owner John M. Verbrugee, knew or
24  should have known that Global did not have a farm labor contractor license in the
25  summer of 2004.   Valley Fruit's Co-owner John M. Verbrugee admitted he never
26  inquired as to whether Global had a license in Washington before October 2004.
27  Such knowledge should have prompted Valley Fruit to investigate Global and
28  would have revealed its discriminatory practices towards the Claimants.  Instead,

First Amended Complaint - 40

Valley Fruit continued to use Global's services until the first contract expired after November 2004, and entered into a second contract in 2005.

192. Valley Fruit knew or should have known that Global was under state and federal investigations and were assessed penalties for violating state and federal law. Such knowledge should have prompted Valley Fruit to investigate Global and would have revealed its discriminatory practices towards the Claimants, including, but not limited to the substandard housing and/or bad living conditions at the following locations, which were listed on the Claimants' clearance orders:

    a. Qual Ridge Apartments, 1500 West Mead Avenue, Yakima, WA: 100 Occupants;

    b. Mead Manor Apartments, 1502 South 10th Avenue and 1006 West Mead Avenue, Yakima, WA: 61 Occupants;

    c. 313 North 6th Avenue, Yakima, WA: 25 Occupants;

    d. Canyon Park Apartments, Canyon Drive, Prosser: 49 Occupants.

    e. Metaline West Apartments; Metaline Street, Kennewick, WA: 50 Occupants;

    f. 1671 Houhgton Road, Zillah, WA: 19 Occupants;

    g. 381 Buena Loop Road, Zillah, WA: 16 Occupants;

    h. 9386 Road "G", Royal City, WA: 32 Occupants.

### Race/National Origin Discrimination at Valley Fruit

193. The Claimants belong to a protected class (Thai/Asian), the Claimants were qualified to do the work and they performed their jobs satisfactorily, the Claimants suffered adverse employment actions by being subject to adverse terms and conditions as described above and below, and similarly situated individuals outside the protected class were treated more favorably, or other circumstances surrounding the adverse employment actions giving rise to an inference of discrimination including but not limited to a hostile environment.

//

//

//

First Amended Complaint - 41

*Adverse Terms and Conditions With Respect to*
*Housing at Valley Fruit*

194.   The Claimants were subject to adverse terms and conditions with respect to the uninhabitable and/or substandard living conditions while working at Valley Fruit.  The non-Thai workers, including but not limited to the Mexicans workers, were not subjected to the same uninhabitable and/or substandard living conditions as the Thai workers while working at Valley Fruit.

195.   The Claimants were required to live in overcrowding housing during the time they worked at Valley Fruit.  Some of the Claimants had to sleep on the floor due to the overcrowding.

196.   Some of the Claimants' housing had no hot water and no heater even though it was very cold.  Claimant MK complained to his crew leader and Global's Supervisor Charlie Blevins that it was cold in the house, but they told him "just put more layers of clothes on."  Some of the Claimants would become ill from the lack of heat at the house.  Global provided no treatment or medicine to treat for these illnesses.

197.   Sometimes there was no running water or electricity at the housing.

198.   The refrigerator at the housing was too small to hold food for all the Claimants for one week, causing them to have no or insufficient food by the end of the week.  According to Claimant DK, sometimes there was no food to eat and all they ate was apples at Valley Fruit. According to Claimant MK, there were times when they had no food to eat because they were not transported to the store. According to BC, the Claimants would run out of food sometimes by the end of the week. The Thai workers would ask if they could go to the store and their crew leader would tell them that Pranee Tubchumpol wouldn't let him take them to the store to buy food because of the fuel costs. Global's supervisor Charlie Blevins would yell and shout at the crew leader if he went over the amount budgeted for gas.

First Amended Complaint - 42

199.   Sometimes some of the Claimants had to use the restroom in the apple farms in order to urinate and defecate due to the lack of toilet facilities because of the overcrowded housing.

200.   Some of the houses were infested with flies and cockroaches.

201.   Some of the houses lacked a washer and dryer so the Claimants had to hand wash their clothes and dry their clothes outside.

202.   To cook, the Claimants had to buy their own pots, pans, and dishes.

203.   The Claimants were also subjected to unsafe and overcrowded transportation from the housing to the farm during the time they worked at Valley Fruit.  To get to Valley Fruit, approximately thirty to forty Thai workers rode in Global's crowded bus, which lacked a sufficient number of seats for all the workers, forcing some to sit on water coolers.

### *Improper Deductions, Denial and/or Delay of Pay, and/or Long Periods of No Work at Valley Fruit*

204.   The Claimants were subject to improper deductions, denial and/or delay of payment of wages for work performed, and long periods of no work at Valley Fruit.  The non-Thai workers who also worked at Valley Fruit, including but not limited to the Mexicans workers, were not subjected to improper deductions, denial and/or delay of pay, and long periods of no work at Valley Fruit.

205.   While working at Valley Fruit, the Claimants were subjected to improper deductions, such as Washington State income tax.

206.   Global told some of the Claimants that the money that was deducted from their paychecks was sent to their families in Thailand, but their families never received the money.  When the Claimants complained about the money not being sent to Thailand, Pranee Tubchumpol would respond by saying that "Global is short on money" or that Global didn't have the money.

First Amended Complaint - 43

207.   Some of the Claimants received no payment for work performed at Valley Fruit.  Multiple check stubs reflected a check amount of $0 being paid to Claimants who worked at Valley Fruit.

208.   The Claimants' pay was often late while working at Valley Fruit.

209.   Contrary to promises of abundant work made when recruited, the Claimants were subject to long periods of no work and there was not enough work at Valley Fruit. According to Claimant DK, sometimes there was no work for up to two weeks, and therefore no pay, and other times there was only work for two to three days for two to three hours instead of the forty hours per week he was promised at Valley Fruit. Claimant MK confirmed that sometimes he would only work two to three days per week, and he did not have any work for two weeks. According to Claimant KI, there was no work for seventeen days at Valley Fruit. Claimant SN confirmed there was no work for one week while at Valley Fruit. Claimant BC confirmed sometimes there was no work at Valley Fruit even though he was promised to work eight to nine hours per day.

210.   According to Claimant DK, he was paid an allowance of $50 per week, although the payment was often late, and the rest of the money was supposed to be sent back to Thailand. The Claimants complained about the $50 allowance and requested for an allowance increase of $100 because it was not enough money for food but Global refused.

211.   According to Claimant UW, because the Claimants lacked money for food they would sometimes run out of food and were relegated to killing birds and rabbits in the field for food.  According to Claimant UW, a man and woman kept going to his wife's house in Thailand and threatening her and yelling at her about the money he had to borrow for the recruitment.  Similarly, Claimant JC confirmed that the recruitment company sent someone to his house in Thailand to demand that his family pay for the recruitment fee.

First Amended Complaint - 44

212.    Pranee Tubchumpol told Claimant JC that the farm owner did not pay Global so they were not going to pay the Claimants.

### *Different Terms and Conditions at Valley Fruit*

213.    The Claimants were subject to different terms and conditions because the non-Thai workers, including but not limited to the Mexican workers, were treated more favorably than the Thai workers while working at Valley Fruit.

214.    Valley Fruit's employees gave better assignments to the Mexican workers. The Mexicans picked the fruit at hand height and they did not have to pick the little (extraneous) apples from the tops of the trees, whereas the Thai workers, had to pick the apples from the taller trees and the tops of the trees, which was slower and harder, because they had to keep climbing up the trees.

215.    The Thai workers were mostly assigned the plots that had the tall trees, whereas the Mexicans were assigned the plots with the shorter trees.

216.    The Thai workers had to dig holes for planting when the apples weren't ready to be picked, which was harder work.

217.    The Mexican workers would leave the worksite when they wanted but the Thai workers could not leave until the assignment was completed.

218.    The Mexican workers could stop working when it was too hot outside but the Thai workers could not stop working when it was 100 degrees.

219.    The Mexican workers were hired to do specific work but the Thai workers had to finish the work of the Mexican workers when the Mexican workers did not complete it.

220.    The Thai workers had to work harder than the Mexican workers because they had a quota to meet.

//

First Amended Complaint - 45

### *Restrictions on the Claimants' Movements at Valley Fruit*

221.   The Claimants were unable to leave the premises and their movements were restricted while working at Valley Fruit. The non-Thai workers who also worked at Valley Fruit, including but not limited to the Mexican workers, were able to leave the premises and their movements were not restricted while working at Valley Fruit.

222.   The Claimants were unable to travel alone while working at Valley Fruit and they were monitored 24 hours.

223.   Global's Supervisor Pranee Tubchumpol told the Claimants at group meetings in Washington, "Don't associate with people from the outside even if they are Thai people and not to talk to other people."  Before KI came to America, Pranee Tubchumpol asked him if he had any relatives in America and told him not to have contact with relatives in America.

224.   The Claimants were subject to a curfew during the time they worked at Valley Fruit. Global's supervisor Charlie Blevins would come around and check on them Valley Fruit. If the Thai workers were not in bed, they were given a warning that they would be sent back home.

225.   The Claimants were threatened and told not to go anywhere, not to contact outsiders, or complain, or they would be sent back to Thailand.  Global's supervisor Pranee Tubchumpol and Charlie Blevins told the Claimants that if they broke any of the rules they would be sent back to Thailand.

226.   According to MK, Global's Supervisor Charlie Blevins threatened the Claimants because a Thai worker called an attorney to the Valley Fruit farm complaining that they were treated badly. Charlie Blevins became upset because the attorney came to the farm and wanted to interview the Thai workers. After the attorneys left, Charlie Blevins came to the house and put a pistol and shotgun on the table and demanded that the culprit come forward.

First Amended Complaint - 46

227.   Global would take roll call of the Claimants before and after they got off the bus.

### *Additional Harassment at Valley Fruit*

228.   The Claimants were subjected to verbal or physical conduct (including but not limited to abusive language, exorbitant and/or unlawful recruitment fees, confiscation of passports, uninhabitable housing, insufficient food, inadequate pay, demeaning job assignments, and threats and intimidation) based on their national origin and/or race, the conduct was unwelcome, and the conduct was sufficiently severe or pervasive to alter the conditions of the Claimants' employment and create an abusive working environment.  Further, the working conditions had become so intolerable that the Claimants felt compelled to escape and thereby were constructively discharged.

229.   Global's supervisors and crew leaders harassed and/or threatened the Claimants in order to meet the quotas, which were set by Valley Fruit.

230.   Valley Fruit's supervisors also came out in to the fields to make sure the Claimants were picking correctly and meeting quotas.

231.   Global's supervisors pressured the Claimants to work harder and faster or threatened to expel them to Thailand if they did not. Claimant SS confirmed that the Claimants were so rushed to meet the quota that sometimes their hands would bleed.

232.   Some crew leaders constantly shouted at some of the Claimants, telling them that they were not reaching the targets and/or quotas, and ordering them to work faster to meet the farm's quota.  If the Claimants did not meet the quota, the crew leaders threatened that they would take money from their checks.

233.   Some of the Claimants were disciplined by being sent to the bus and/or not receiving pay if they did not meet the quota.

//

First Amended Complaint - 47

### *Retaliation at Valley Fruit*

234.   Some of the Claimants complained to Valley Fruit's personnel that they needed to work more hours because they had substantial debt. Valley Fruit's response was that they had to continue working according the work schedule set by the farm. Some of the Claimants complained to Global's supervisors about the pay issues, not being paid properly, their substantial debt, the lack of money to buy food, and not having enough work at Valley Fruit.

235.   No corrective action was taken in response to the Claimants' complaints.  Instead, the Claimants were subject to threats of deportation or harsher treatment, higher demands of production, reduced work assignments, or even transfer to other farms in other states after they complained.

### *Valley Fruit's Pattern or Practice/Standard Operating Procedure*

236.   Twenty-nine Claimants filed Charges of Discrimination against Valley Fruit.  CP Marut Kongpia's charge was dually filed with the EEOC and the Washington State Human Rights Commission.  According to the worksharing agreement between the Washington State Human Rights Commission ("FEPA") and the EEOC, each designate the other as its agent for the purpose of receiving and drafting charges.  The EEOC's receipt of charges on the FEPA's behalf will automatically initiate the proceedings of both EEOC and FEPA.

237.   Plaintiff EEOC incorporates by reference, all of the foregoing paragraphs which reflect that a pattern and practice of participating in or allowing discrimination, harassment, retaliation, and/or constructive discharge persisted at Valley Fruit for the durations of its contracts with Global from 2004 through 2005. Based on information and belief, there were approximately 37 Claimants working at Valley Fruit from 2004 through 2005 before and during the contract periods.

First Amended Complaint - 48

**STATEMENT OF CLAIMS**
**FIRST CLAIM FOR RELIEF—PATTERN OR PRACTICE OF
DISCRIMINATORY TREATMENT BECAUSE OF NATIONAL ORIGIN,
RACE, RETALIATION, AND/OR CONSTRUCTIVE DISCHARGE**
**(42 §§ 2000e-2(a) and 2000e-3(a))**

238.    Plaintiff EEOC incorporates by reference all other paragraphs as set forth herein, including without limitation all of the above paragraphs and ¶¶ 1-237.

239.    At all times relevant to this action, the Claimants were employed by Global.

240.    Since 2003, Global supplied the Claimants to work at one or more farms owned and operated by the Farm Defendants.

241.    Since 2003, Global engaged in a pattern or practice of unlawful discriminatory employment practices at its facilities in Los Angeles and Beverly Hills, California and at the Farm Defendants' farms located in Washington, in violation of §§ 703(a) and 704(a) of Title VII, 42 U.S.C. § 2000e-2(a) by discriminating against the Claimants with respect to the terms and conditions of their employment because of their Asian race and/or  Thai national origin; subjecting the Claimants to harassment and hostile work environment because of their Asian race and/or Thai national origin; retaliating against employees for engaging in protected activity including but not limited to opposing and/or complaining about the discriminatory terms and conditions of employment, harassment, and/or hostile work environment; and/or constructively discharged the Claimants by subjecting them to intolerable working conditions.

242.    Global's pattern and/or practice of discriminatory treatment includes, without limitation, harassment, hostile work environment, disparate treatment, constructive discharge, and retaliation against employees for engaging in protected activity including but not limited to opposing and/or complaining about the discriminatory terms and conditions of employment, harassment, and/or hostile work environment.

First Amended Complaint - 49

243.    Since at least 2004, Green Acre engaged in, knew of, or should have known of the unlawful employment practices and pattern or practice of such unlawful acts that occurred at or around its Washington location and/or Global's California locations in violation of §§ 703(a) and 704(a) of Title VII, 42 U.S.C. §§ 2000e-2(a) and 2000e-3(a) by discriminating against the Claimants with respect to the terms and conditions of their employment because of their Asian race and/or Thai national origin; subjecting the Claimants to harassment and hostile work environment because of their Asian race and/or Thai national origin; retaliating against employees for engaging in protected activity including but not limited to opposing and/or complaining about the discriminatory terms and conditions of employment, harassment, and/or hostile work environment; and/or constructively discharging the Claimants by subjecting them to intolerable working conditions.

244.    Green Acre's pattern and/or practice of discriminatory treatment includes without limitation, harassment, hostile work environment, disparate treatment, constructive discharge, and/or retaliation against Claimants for engaging in protected activity including but not limited to opposing and/or complaining about the discriminatory terms and conditions of employment, harassment, and/or hostile work environment.

245.    Since at least 2004, Valley Fruit engaged in, knew of, or should have known of the unlawful employment practices and pattern or practice of such unlawful acts that occurred at or around its Washington location and/or Global's California locations in violation of §§ 703(a) and 704(a) of Title VII, 42 U.S.C. §§ 2000e-2(a) and 2000e-3(a) by discriminating against the Claimants with respect to the terms and conditions of their employment because of their Asian race and/or Thai national origin; subjecting the Claimants to harassment and hostile work environment because of their Asian race and/or  Thai national origin; retaliating against employees for engaging in protected activity including but not limited to opposing and/or complaining about the discriminatory terms and conditions of

First Amended Complaint - 50

employment, harassment, and/or hostile work environment; and/or constructively discharging the Claimants by subjecting them to intolerable working conditions.

246.    Valley Fruit's pattern and/or practice of discriminatory treatment includes without limitation, harassment, hostile work environment, disparate treatment, constructive discharge, and/or retaliation against Claimants for engaging in protected activity including but not limited to opposing and/or complaining about the discriminatory terms and conditions of employment, harassment, and/or hostile work environment.

247.    The effect of the practices complained of above has been to deprive Claimants of equal employment opportunities and otherwise adversely affect their employment status because of their race and national origin.

248.    The unlawful employment practices complained of above were and are intentional.

249.    The unlawful employment practices complained of above were done with malice or with reckless indifference to the federally protected rights of Claimants.

### SECOND CLAIM FOR RELIEF – HOSTILE WORK ENVIRONMENT/HARASSMENT
### (42 U.S.C. §§ 2000e-2(a))

250.    Plaintiff EEOC incorporates by reference all other paragraphs as set forth herein, including without limitation all of the above paragraphs and ¶¶1-249.

251.    Since 2003, Global has engaged and continues to engage in unlawful employment practices at is facilities in Los Angeles and Beverly Hills, California and at the Farm Defendants' farms located in Washington, in violation of § 703(a) of Title VII, 42 U.S.C. § 2000e-2(a) by subjecting Claimants to harassment and/or a hostile work environment because of their Asian race and/or Thai national origin and/or failing to prevent and promptly correct the harassment and/or hostile work environment.

First Amended Complaint - 51

252.   Since at least 2004, Green Acre engaged in, knew of, or should have known of the unlawful employment practices that occurred at or around its Washington locations and/or Global's California location in violation of § 703(a) of Title VII, 42 U.S.C. § 2000e-2(a) by subjecting Claimants to harassment and/or a hostile work environment because of their Asian race and/or Thai national origin and/or failing to prevent and promptly correct the harassment and/or hostile work environment.

253.   Since at least 2004, Valley Fruit engaged in, knew of, or should have known of the unlawful employment practices that occurred at or around its Washington locations and/or Global's California location in violation of § 703(a) of Title VII, 42 U.S.C. § 2000e-2(a) by subjecting Claimants to harassment and/or a hostile work environment because of their Asian race and/or Thai national origin and/or failing to prevent and promptly correct the harassment and/or hostile work environment.

254.   The harassment and/or hostile work environment against the Claimants that continued from one Farm Defendant to the next was sufficiently severe and/or pervasive as to alter the terms and conditions of their employment with Global and at each Farm Defendant's location.

255.   Management employees of all Defendants knew or should have known of the harassment and/or hostile work environment against Claimants.

256.   Management employees of all Defendants failed to take appropriate action to prevent or promptly correct the harassment and hostile environment to which the Claimants were subjected.

257.   The effect of the practices complained of above has been to deprive Claimants of equal employment opportunities and otherwise adversely affect their employment status because of their race and/or national origin.

258.   The unlawful employment practices complained of above were intentional.

First Amended Complaint - 52

259.   The unlawful employment practices complained of above were done with malice or with reckless indifference to the federally protected rights of the Claimants.

## THIRD CLAIM FOR RELIEF – DISCRIMINATORY TERMS AND CONDITIONS OF EMPLOYMENT
### (42 U.S.C. §§ 2000e-2(a))

260.   Plaintiff EEOC incorporates by reference all other paragraphs as set forth herein, including without limitation all of the above paragraphs and ¶¶1-259.

261.   Since at least 2003, Global has engaged and continues to engage in unlawful employment practices at is facilities in Los Angeles and Beverly Hills, California and at the Farm Defendants' farms located in Washington, in violation of § 703(a) of Title VII, 42 U.S.C. § 2000e-2(a) by subjecting the Claimants to discriminatory terms and conditions of employment because of their Asian race and/or Thai national origin.

262.   Since at least 2004, Green Acre engaged in, knew of, or should have known of the unlawful employment actions that occurred at or around its Washington location and/or Global's California location in violation of § 703(a) of Title VII, 42 U.S.C. § 2000e-2(a) by subjecting the Claimants to discriminatory terms and conditions of employment because of their Asian race and/or Thai national origin.

263.   Since at least 2004, Valley Fruit engaged in, knew of, or should have known of the unlawful employment actions that occurred at or around its Washington location and/or Global's California location in violation of § 703(a) of Title VII, 42 U.S.C. § 2000e-2(a) by subjecting the Claimants to discriminatory terms and conditions of employment because of their Asian race and/or Thai national origin.

264.   The effect of the practices complained of above has been to deprive the Claimants of equal employment opportunities and otherwise adversely affect their employment status because of their race and/or national origin.

265.   The unlawful employment practices complained of above were and are intentional.

266.   The unlawful employment practices complained of above were done with malice or with reckless indifference to the federally protected rights of the Claimants.

**FOURTH CLAIM FOR RELIEF – RETALIATION FOR ENGAGING PROTECTED ACTIVITY (42 U.S.C. § 2000e-3)**

267.   Plaintiff EEOC incorporates by reference all other paragraphs as set forth herein, including without limitation all of the above paragraphs and ¶¶ 1-266.

268.   Since at least 2003, Global has engaged and continues to engage in unlawful employment practices at is facilities in Los Angeles and Beverly Hills, California and at the Farm Defendants' farms located in Washington, in violation of § 704(a) of Title VII, 42 U.S.C. § 2000e-3 by subjecting the Claimants to retaliation for engaging in protected activity including but not limited to opposing and/or complaining about the discriminatory terms and conditions of employment, harassment, and/or hostile work environment.

269.   In retaliation for Claimants protected activities against what they reasonably believed to be Global's and/or the Farm Defendants' unlawful discrimination against them, Global subjected them to adverse employment actions including without limitation, discipline, transfers, threats, harassment, denial of transportation and food, and a hostile work environment.

270.   Since about 2004, Green Acre engaged in unlawful employment practices at or around its Washington locations and/or Global's California locations in violation of § 704(a) of Title VII, 42 U.S.C. § 2000e-3 by subjecting the Claimants to retaliation for engaging in protected activity including but not

First Amended Complaint - 54

limited to opposing and/or complaining about the discriminatory terms and conditions of employment, harassment, and/or hostile work environment.

271.   In retaliation for Claimants' protected activities at Green Acre, the Claimants were subjected to adverse employment actions including without limitation threats of deportation or harsher treatment, higher demands of production, reduced work assignments, or even transfer to other farms in other states.

272.   Since about 2004, Valley Fruit engaged in unlawful employment practices at or around its Washington locations and/or Global's California locations in violation of § 704(a) of Title VII, 42 U.S.C. § 2000e-3 by subjecting the Claimants to retaliation for engaging in protected activity including but not limited to opposing and/or complaining about the discriminatory terms and conditions of employment, harassment, and/or hostile work environment.

273.     In retaliation for Claimants' protected activities at Valley Fruit, the Claimants were subjected to adverse employment actions including without limitation threats of deportation or harsher treatment, higher demands of production, reduced work assignments, or even transfer to other farms in other states.

274.   The effect of the practices complained of above has been to deprive the Claimants of equal employment opportunities and otherwise adversely affect their employment status because the Claimants engaged in protected activity including but not limited to opposing and/or complaining about the discriminatory terms and conditions of employment, harassment, and/or hostile work environment.

275.   The unlawful employment practices complained of above were and are intentional.

First Amended Complaint - 55

276.    The unlawful employment practices complained of above were done with malice or with reckless indifference to the federally protected rights of the Claimants.

## **PRAYER FOR RELIEF**

Wherefore, the Commission respectfully requests that this Court:

A.      Grant a permanent injunction enjoining Defendant Global, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, from engaging in discrimination—including harassment, disparate treatment, and constructive discharge—on the basis of the Claimants' national origin (Thai) and race (Asian), or a pattern or practice of such discrimination.

B.      Grant a permanent injunction enjoining Defendant Global, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, from engaging in retaliation or a pattern or practice of retaliation.

C.      Grant a permanent injunction enjoining Defendant Green Acre, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, from engaging in discrimination—including harassment, disparate treatment, and constructive discharge—on the basis of the Claimants' national origin (Thai) and race (Asian), or a pattern or practice of such discrimination.

D.      Grant a permanent injunction enjoining Defendant Green Acre, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, from engaging in retaliation or a pattern or practice of retaliation.

E.      Grant a permanent injunction enjoining Defendant Valley Fruit, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, from engaging in discrimination—including harassment,

disparate treatment, and constructive discharge—on the basis of the Claimants'
national origin (Thai) and race (Asian), or a pattern or practice of such
discrimination.

F.    Grant a permanent injunction enjoining Defendant Valley Fruit, its
officers, agents, servants, employees, attorneys, and all persons in active concert or
participation with them, from engaging in retaliation or a pattern or practice of
retaliation.

G.    Order Defendant Global to institute and carry out policies, practices,
and programs which provide equal employment opportunities for individuals of
Thai national origin and Asian race, and which eradicate the effects of its past and
present unlawful employment practices.

H.    Order Defendant Green Acre to institute and carry out policies,
practices, and programs which provide equal employment opportunities for
individuals of Thai national origin and Asian race, and which eradicate the effects
of its past and present unlawful employment practices.

I.    Order Defendant Valley Fruit to institute and carry out policies,
practices, and programs which provide equal employment opportunities for
individuals of Thai national origin and Asian race, and which eradicate the effects
of its past and present unlawful employment practices.

J.    Order Defendant Global to make whole Marut Kongpia and similarly
situated individuals, by providing appropriate backpay with prejudgment interest,
in amounts to be determined at trial, and other affirmative relief necessary to
eradicate the effects of its unlawful employment practices, including but not
limited to reinstatement of Marut Kongpia and similarly situated individuals.

K.    Order Defendant Green Acre to make whole Laphit Khadthan and
similarly situated individuals, by providing appropriate backpay with prejudgment
interest, in amounts to be determined at trial, and other affirmative relief necessary

First Amended Complaint - 57

to eradicate the effects of its unlawful employment practices, including but not limited to reinstatement of Laphit Khadthan and similarly situated individuals.

L.     Order Defendant Valley Fruit to make whole Marut Kongpia and similarly situated individuals, by providing appropriate backpay with prejudgment interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of its unlawful employment practices, including but not limited to reinstatement of Marut Kongpia and similarly situated individuals.

M.     Order Defendant Global to make whole Marut Kongpia and similarly situated individuals, by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described in paragraphs 1 through 276 above, including recruitment fees, relocation expenses, job search expenses, and medical expenses, in amounts to be determined at trial.

N.     Order Defendant Green Acre to make whole Laphit Khadthan and similarly situated individuals, by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described in paragraphs 1 through 276 above, including recruitment fees, relocation expenses, job search expenses, and medical expenses, in amounts to be determined at trial.

O.     Order Defendant Valley Fruit to make whole Marut Kongpia and similarly situated individuals, by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described in paragraphs 1 through 276 above, including recruitment fees, relocation expenses, job search expenses, and medical expenses, in amounts to be determined at trial.

P.     Order Defendant Global to make whole Marut Kongpia and similarly situated individuals, by providing compensation for past and future nonpecuniary losses resulting from the unlawful practices complained of in paragraphs 1 through 276 above, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation, in amounts to be determined at trial.

First Amended Complaint - 58

Q.    Order Defendant Green Acre to make whole Laphit Khadthan and similarly situated individuals, by providing compensation for past and future nonpecuniary losses resulting from the unlawful practices complained of in paragraphs 1 through 276 above, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation, in amounts to be determined at trial.

R.    Order Defendant Valley Fruit to make whole Marut Kongpia and similarly situated individuals, by providing compensation for past and future nonpecuniary losses resulting from the unlawful practices complained of in paragraphs 1 through 276 above, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation, in amounts to be determined at trial.

S.    Order Defendant Global to pay Marut Kongpia and similarly situated individuals punitive damages for its malicious and reckless conduct described in paragraphs 1 through 276 above, in amounts to be determined at trial.

T.    Order Defendant Green Acre to pay Laphit Khadthan and similarly situated individuals punitive damages for its malicious and reckless conduct described in paragraphs 1 through 276 above, in amounts to be determined at trial.

U.    Order Defendant Valley Fruit to pay Marut Kongpia and similarly situated individuals punitive damages for its malicious and reckless conduct described in paragraphs 1 through 276 above, in amounts to be determined at trial.

V.    Grant such further relief as the Court deems necessary and proper in the public interest.

W.    Award the Commission its costs of this action.

//
//
//
//

First Amended Complaint - 59

1

<u>JURY TRIAL DEMAND</u>

2      The Commission requests a jury trial on all questions of fact raised by its

3 complaint.

4

5 Dated: March 20, 2012                    Respectfully Submitted,

6                                         P. DAVID LOPEZ

7                                         General Counsel

8                                         JAMES L. LEE

9                                         Deputy General Counsel

10                                        GWENDOLYN YOUNG REAMS

11                                        Associate General Counsel

12                                        U.S. EQUAL EMPLOYMENT

13                                        OPPORTUNITY COMMISSION

14                                        131 M Street, NE

15                                        Washington, DC 20507

16

17                                        By: /s/ Anna Y. Park

18                                        ANNA Y. PARK

                                          Regional Attorney

19

20                                        U.S. EQUAL EMPLOYMENT

                                          OPPORTUNITY COMMISSION

21                                        Los Angeles District Office

22                                        (213) 894-1080

23

24

25

26

27

28

First Amended Complaint - 60

## Certificate of Service via Electronic Filing System

I am, and was at the time the herein mentioned mailing took place, a citizen of the United States, over the age of eighteen (18) years and not a party to the above-entitled cause.

I am employed in the Legal Unit of the Los Angeles District Office of the United States Equal Employment Opportunity Commission.

My business address is Equal Employment Opportunity Commission, Los Angeles District Office, 255 East Temple Street, Fourth Floor, Los Angeles, CA 900l2.

On the date that this declaration was executed, as shown below, I served the foregoing documents with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following:

Justo G Gonzalez, jgg@stokeslaw.com
Brendan Victor Monahan, bvm@stokeslaw.com
Sean A Russel, sean.russel@stokeslaw.com
Gerald L. Maatman, Jr., gmaatman@seyfarth.com
Christopher J. DeGroff, cdegroff@seyfarth.com
Laura J. Maechtlen, lmaechtlen@seyfarth.com

Timothy Michael Durkin, AUSA(EDWA).TDurkinECF@usdoj.gov
Daniel Herman Weiss, Daniel.Weiss@usdoj.gov

and via U.S. Mail in a sealed envelope with postage therein fully prepaid, in regular mail at Los Angeles, County of Los Angeles, State of California, addressed as follows:

Agent for Service for
Global Horizons, Inc.
d/b/a Global Horizons Manpower, Inc.
Mordechai Orian
410 Atkinson Drive Room 813
Honolulu, Hawaii 96814

First Amended Complaint - 61

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Randolph S. Shiner
11150 Santa Monica Blvd., Suite 1470
Los Angeles, CA 90025

Michael Green
841 Bishop Street, Suite 2201
Honolulu, Hawaii 96813
michaeljgreen@hawaii.rr.com

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 20, 2012, at Los Angeles, California.

/s/ Lorena Garcia-Bautista
Lorena Garcia-Bautista, CA SBN 234091
Attorney for Plaintiff
U.S. Equal Employment Opportunity Commission
255 E. Temple St., 4th Floor, Los Angeles, CA
Telephone: (213) 894-1108
Fax: (213) 894-1301
Lorena.garcia@eeoc.gov

First Amended Complaint - 62