FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Mar 20, 2020

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

     Plaintiff,

  v.

GLOBAL HORIZONS, INC., doing
business as Global Horizons
Manpower, Inc.; GREEN ACRE
FARMS, INC.; VALLEY FRUIT
ORCHARDS, LLC; and DOES 1-10,
inclusive,

     Defendants.

———————————————

GREEN ACRES FARMS, INC; and
VALLEY FRUIT ORCHARDS,
LLC,

     Counter Claimants,

  v.

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

     Counter Defendant.

NO:  2:11-CV-3045-RMP

ORDER RESOLVING SUMMARY
JUDGMENT MOTIONS

BEFORE THE COURT are the following motions for partial summary judgment: (1) Plaintiff Equal Employment Opportunity Commission's (the "EEOC's")' Motion for Summary Judgment Regarding Defendant Green Acre Farms, Inc.'s ("Green Acre") Joint Employer Liability for Discriminatory Treatment and Hostile Work Environment, ECF No. 715; (2) the EEOC's Motion for Summary Judgment Regarding Defendant Valley Fruit Orchards, LLC's ("Valley Fruit's") Joint Employer Liability for Discriminatory Treatment and Hostile Work Environment, ECF No. 722; (3) the EEOC's Motion for Summary Judgment on the EEOC's Pattern-or-Practice Claims of Disparate Treatment, Hostile Work Environment, and Constructive Discharge, ECF No. 747; and (4) Green Acre and Valley Fruit's (collectively, the "Growers'") Motion for Partial Summary Judgment, ECF No. 710. Also pending before the Court is the Growers' Joint Motion for Summary Judgment on All Claims. ECF No. 774.

Having heard oral argument from the parties on December 16, 2019, and March 5, 2020, reviewed all submissions related to the pending motions as well as the extensive record, and studied the relevant law, the Court is fully informed.

## FACTUAL BACKGROUND

The following facts are undisputed unless otherwise noted.[1]

---

[1] The Growers object to numerous of the EEOC's asserted facts in support of partial summary judgment on the basis that the evidence they are based on is vague, non-

Defendant Green Acre is a Washington corporation, owned and operated by the Morford family, that grows hops, wheat, dill, mint, nectarines, pears, peaches, and apples.

Valley Fruit is a Washington Liability Company that was owned and operated by the Verbrugge family during 2004 and 2005, and grew cherries, apples, pears, and peaches. ECF No. 777 at 2. Valley Fruit sold its assets and ceased operations in 2018. *Id.*

/ / /

/ / /

/ / /

specific as to time, conclusory, and lacks foundation. *See* ECF No. 744. Similarly, the EEOC objects to documents submitted by the Growers on the ground of "authenticity (trustworthiness)" and hearsay. *See* ECF No. 795 at 10, 15.

The Court does not address these generalized objections in this section of the order, but instead has scrutinized both parties' statements of facts, and the materials that they cite in support, to exclude the irrelevant material or material that "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c). The undisputed facts in this section of the order have not been challenged by either party.

***Growers' Relationship with Labor Services Contractor Global Horizons, Inc.***

Global Horizons, Inc. ("Global") provided farm labor services and assigned H-2A guest workers to the Growers' farms in Washington from approximately summer 2004 until October 2005, for Green Acre, and November 2005, for Valley Fruit. ECF Nos. 776 at 7; 777 at 3. Jim Morford, owner and officer of Green Acre in 2004 and 2005, was "responsible for" Green Acre's interactions with Global. ECF Nos. 776 at 2; 756-8 at 3. John Verbrugge, owner and officer of Valley Fruit, was Valley Fruit's point of contact with Global. ECF No. 777 at 2.

Morford and Verbrugge recount that their respective farms contracted with Global to address labor shortages that began in 2003. ECF Nos. 776 at 2; 777 at 2. EEOC contests that there were labor shortages at that time, ECF No. 794 at 5; however, the Court notes that the EEOC stipulated to the existence of labor shortages beginning in 2003, in the parties' 2014 Joint Statement of Uncontroverted Facts. ECF No. 528 at 3.

Nevertheless, Global first provided temporary orchard labor services to the Growers in approximately summer 2004. *See* ECF No. 775 at 3 (citing ECF No. 778-1); 795 at 6. Global was not a licensed farm contractor between January and October 2004. *See* ECF No. 718-13 at 24.

In November 2004, Green Acre signed a Letter of Intent memorializing that it was contracting with Global to provide "up to 190 workers for pruning and

harvesting fruit on Green Acre Farms from January 10, 2005 to November 10, 2005." ECF No. 776 at 2, 11. The Letter of Intent recited: "The workers will be recruited, transported, housed, paid and supervised by [Global]." *Id.* at 11.

Valley Fruit entered a "Farm Labor Contractor H-2A Agreement" ("Valley Fruit Agreement") with Global in January 2005. ECF No. 777 at 17. The Valley Fruit Agreement provided for pruning, training, harvest, thinning, and tree planting from January 1, 2005, through November 1, 2005. *Id.* The Valley Fruit Agreement provided that all workers who performed work under the Agreement would be employees of Global and would at all times be subject to the sole and direct supervision of Global. *Id.* at 18.

The Growers terminated their relationships with Global in October 2005 (Green Acre) and November 2005 (Valley Fruit), when their contracts with Global expired. ECF Nos. 776 at 7; 777 at 9.

### H-2A Workers from Thailand

Global was required to hire both foreign and domestic workers in order to comply with the requirements of the federal H-2A guest worker program. ECF Nos. 775 at 6; 795 at 16. Global's primary orchard managers in 2005, Charlie Blevins and Bruce Schwartz, testified that they observed that Global's domestic H-2A workers were primarily of Hispanic and/or Mexican descent, but Global did not track its employees by race or national origin. ECF Nos. 778-4 at 3; 778-7 at 3−4.

Blevins and Schwartz aver that all of the workers hired by Global pursuant to their contracts with the Growers were hired to perform the same work. *Id.*

Mordechai "Morti" Orian was Global's Chief Executive Officer in 2004 and 2005. *See* ECF No. 724-1 at 9−10. Jose Cuevas was hired as an orchard supervisor by Global in January 2004. ECF No. 801-10 at 5. In a 2013 deposition upon which EEOC heavily relies for arguing discriminatory intent, Cuevas recalled conversations that he was a part of, or observed, between Orian and the owners of Valley Fruit and Green Acre before Global brought the workers to the Growers' farms. *Id.* at 8. Cuevas' 2013 deposition was conducted through an interpreter, although the excerpt of the deposition in the record does not indicate the interpreter's name, whether the interpreter was certified, or that the interpreter certified the accuracy of the interpretation. *Id.* at 2−28. Furthermore, the transcript indicates that during the deposition Growers' counsel requested that EEOC counsel not interrupt Cuevas' responses to slow down Cuevas' responses to allow the interpreter to catch up, but instead allow the interpreter to control the interruptions. *Id.* at 10.

EEOC relies almost exclusively on Cuevas' deposition testimony to support its prima facie case of discrimination, and Growers object strenuously to the deposition's admissibility. The Court includes segments of Cuevas' deposition verbatim to illustrate the difficulty in comprehending the meaning of Cuevas' testimony.

During the deposition, Cuevas recalled that Orian commented that there

would be a "good future for the company and also for the employers of the state of

Washington because the labor from people from Thailand especially were going to

advance a lot." ECF No. 801-10 at 8. Cuevas described Verbrugge's reaction to the

comment as "indicating he didn't know what was going to—what was happening,

that's why he was in agreement." *Id.* at 9. Cuevas clarified his response: "What I

was saying is that he was just listening to Mr. Verbrugge or Valley Fruit to what

Morti was suggesting. And Valley Fruit was just observing and they were being

concerned because they wanted to have the labor to pick their crops." *Id.* at 10.

Cuevas recalled Schwartz saying, "that the Thai workers were really hard workers

and they were not bringing lawsuits or anything, they just wanted to work. And that

will show an agreement or a bright future because of that." *Id.* at 12. EEOC counsel

asked Cuevas whether anyone responded to Schwartz's comment, and Cuevas

responded, "No. Everything was just left like that." *Id.* However, EEOC counsel

asked, "And Mr. Schwartz said nothing else during that earlier conversation you

mentioned where you said the Thai workers were hard workers and weren't suing?"

*Id.* at 13. Cuevas responded, "He would just mention that the Hispanic workers will

spend the whole time just questioning and suing. However, the people from

Thailand would not ask any questions and would just come to work and willing to

work seven days a week." *Id.* Cuevas described Verbrugge of Valley Fruit as "kind

of nodding like indicating an agreement." *Id.* Cuevas recalled that "Morti as well

was in agreement," but Cuevas described himself as being "in disagreement because I have had a history there for years and it was that way." *Id.* at 13−14.

Cuevas further recounted a conversation that he recalls hearing within the first two or three days of his employment with Global around late January 2004. ECF No. 801-10 at 4, 13−15. Cuevas said that he heard Morford of Green Acre having a conversation with Orian and a "driver . . . from Arizona or California" who "had a bus to transport people." *Id.* at 15. Cuevas recounted that the first thing he recalled being said in the conversation as follows, with EEOC counsel's questions and Cuevas' responses noted:

> A.  It caught my attention a lot, the fact that they had the crew from Thailand and they were working with hoes between rocks and it was really hot and they mentioned that they were not afraid of the heat and the hard work and they were watching them and recording them with a video camera.  They would say, this is what we need here because the people that come from Mexico or the Hispanics from this area don't work like this.
>
> Q. Who said that?
>
> A.  Morti said it.  And Mr. Morford affirmed it.
>
> Q. So let me just try and track who said what.  And to the best that you can, please guide me through that.  I need to know who said what.
>
> A.  Morti was mentioning that.
>
> Q. So you mentioned that somebody said a comment to them how the Thai workers weren't afraid of heat and hard work.  Who said that?
>
> A.  That's right.  Morti said it.

Q.  Okay.  And then you mentioned that somebody said that we need Thai workers because people from Mexico or Hispanics from this area don't work this way.  Who said that?

A.  Morti said it as well.  I think that Bruce was there at that time, too.

Q.  Are you guessing or do you remember?

A.  I'm trying to remember.  I think he was there but –

Q.  So you're saying he might have been there, you're just not sure?

A.  No, that Morti was.

Q.  And once Morti said we need Thai workers and then made the reference to people from Mexico or Hispanics from this area not working that way, did anybody respond to Morti's comment?

A.  Mr. Morford.

Q.  What did he say?

A.  He said that it was true because he was having a lot of difficulties for them to follow the employment rules at his place and therefore they were firing people almost every day.

Q.  Anything else that Mr. Morford said in response to that?

A.  He indicated that that was something that was going to benefit him a lot.

Q.  Did Mr. Morford say anything specifically about Mexican workers?

A.  He will agree that they will come up with excuses for everything and they ask questions about this and that.  They question too much. And they didn't advance enough.

Q.  They didn't advance enough?

A.  Right.

Q.  Now was he talking about workers generally or did he actually say Mexicans?

[Comment from counsel and request for repetition of the question from the interpreter omitted.]

A.  Specifically he will focus specifically [sic] on Mexicans and those who were asking for a lot of details.

Q.  Okay.  And I just want to clarify.  Was he saying there are certain workers that request a lot of details from among all his workers or was he saying Mexican workers?

A.  Well, generalized between all of the Hispanics or Mexicans.

Q.  And you heard him use the word Mexican during that conversation?

A.  Yes.

Q.  Did Mr. Morford mention that Mexican workers would create a lot of pretext against doing the work that was asked of them?

[Exchange between counsel regarding objections.]

A.  Yes.

Q.  Did he specify about what kinds of questions Mexicans would make of the work being requested of them?

A.  For example, like what time they were going to give the break.

Q.  Anything else?

A.  And on the other hand, they will require them a certain amount, even though it was by the hour, they would require them a certain production amount.  And it was impossible to fulfill all of those rules or follow those rules.

Q.  Did he make any comments about the attendance of the work attendance [sic] of Mexican workers?

A.  They were really tardy also.

Q.  Did he mention anything about absences of Mexicans?

A.  He will mention, well, rather, he will indicate that they were not interested in working.

Q.  And again, this is all part of that one conversation?

A.  Yes.

Q.  Did he mention anything about Mexican workers quitting?

[Request to repeat the question omitted]

A.  Well, they will quit because of the strict rules that they would set there.

Q.  Did he mention that he had a preference for Thai workers?

A.  Yes.

Q.  What exactly did he say?

A.  That they were going to buy some fields where they could concentrate on all of the people they were bringing and keep them outside the city so they wouldn't have any communication with anybody.  From there they would look for land to buy.

Q.  Let me make sure I'm tracking the right person.  When you say he said he was going to buy property to concentrate the workers there, that's Mr. Morford you're saying?

A.  Well, that was the conversation that was going between them two because it was Morti and Bruce suggesting to buy land.

Q.  Okay.

A.  [sic]² So just to make sure I'm clear and the record is clear, when you're saying that somebody was mentioning that they were going to buy land to have all the Thai workers concentrated there that was not Mr. Morford saying that?

A.  He was in the conversation that they were carrying on.

Q.  But he's not the one who said he was going to buy that land?

A.  What he was saying is he would just hire the Mexican people with the labor.

Q.  And who as you just mentioned who said that they were going to buy this land or that this land would be far away from the city so that the Thai workers wouldn't interact with other people?

A.  Morti was the one that had that plan.

Q.  Morti said that as part of that conversation with Mr. Morford?

A.  Yes.

Q.  Did he say why he wanted to have the Thai workers far away from the city and not have them speaking with others?

A.  So nobody would be able to communicate with them and then that way he changed the vision they had towards work on them.

Q.  I'm sorry.  I'm not so clear.

A.  No – may I be able to say it a different way?

Q.  No.  The concern was that who was going to influence whose view of work?

A.  The concern was that somebody can come and give them the information about the legal rights to the people and have friends that

---

² The deposition transcript indicates that this is an answer, but the surrounding context indicates that it is a continuation of counsel's question to Cuevas.

could let them know about a different lifestyle. For some reason they wanted to keep them isolated to keep them always –

Q. I'm sorry, please continue.

A. And that way to have a secure labor.

Q. And I just want to make sure, what you just mentioned about the desire to have the Thai workers away from people who may inform them about their rights or different --- or talk to them about their rights or show them a different lifestyle, that comment was made during this conversation that you heard?

A. Several times.

Q. Several times including this one that we're talking about?

A. Yes.

Q. Okay. And who said that during this conversation?

A. Morti and Bruce were sharing this between their studies [sic], they had trouble through different–they had traveled through different countries.

Q. Let me stop you because it seems like you're going into a different issue. And we'll get back to it. But right now I'm just focusing on the comment that somebody made that they didn't want the Thai workers communicating with others because they might talk to them about their rights or show them a different lifestyle. Who said that during this conversation?

A. That was an idea that Morti and Bruce had.

Q. But who said that during this conversation?

A. That was their concern and they were sharing that with Mr. Morford so nothing will change and that's why it was mentioned.

Q. I still want to figure out who said that. Was it Bruce or Morti? Because you said they were both communicating that.

A.  The two of them were mentioning the same thing.

Q.  Thank you.  And so now you were moving to a different topic where you said one—who was mentioning they had studied this issue and gone to different countries?

A.  Bruce mentioned that they had traveled through Mexico and South America and got information about how many people of these people were in their state and all of the countries had people here.  Only Thailand was the only country that they didn't have people in the state of Washington.  And, therefore, they will believe it was more indicated to bring people here and that way there wouldn't be anybody who will guide them about their rights and all that and they will just come here to work.

Q.  Did anybody respond to that comment by Bruce during this conversation?

A.  It was just like indicated an agreement with their heads.

Q.  You were nodding your head up and down, is that how you were saying that they were indicating agreement?

A.  Them, yes.

Q.  Did anybody else say anything during this conversation between Jim Morford, Morti, Bruce Schwartz and yourself?

A.  It was suggesting to them was that always the local people already knew the job, they just needed to treat them with style and depending on how we will treat them then they will—that would depend on the effort they would put into the work because in my experience I—you always believed that between employers and workers you must work like friends, not like enemies.

ECF No. 801-10 at 16−26.

The only other evidence that EEOC proffers of a plan or scheme related to bringing in Thai workers are statements that Orian allegedly "made during the *Perez Farias* case [.]"  ECF No. 794 at 7 (citing ECF No. 549-7 at 6).

ORDER RESOLVING SUMMARY JUDGMENT MOTIONS ~ 14

The Court discusses the *Perez Farias* case later in this Order, but notes with respect to the cited Orian deposition that the caption of the deposition bears a different case number than *Perez Farias*, different claimants than in the *Perez Farias* caption, and the decision making body was the "American Arbitration Association," rather than a judge in the Eastern District of Washington, where the *Perez Farias* matter was ultimately decided. *Compare* ECF No. 549-7 at 2 (2008 Global 30(b)(6) deposition with Orian in *Nasee, Kamilo, et al v. Global Horizons*, No. 11 160 00167 07) *with Perez-Farias v. Global Horizons*, 05-cv-3061-RHW (E.D. Wash.).

In contrast to the excerpts of Cuevas' testimony emphasized by the EEOC, in a 2014 deposition for this matter also submitted by the EEOC, Orian testified that the Growers "didn't get involved in" the decision of which country the H-2A workers came from. ECF No. 724-1 at 10. Rather, Orian informed the Growers that he was bringing workers from Thailand. *Id*. The Growers knew that Global would be assigning workers it hired from Thailand under the H-2A program, but there is no evidence that the Growers directed Global to solicit workers from Thailand. *See* ECF Nos. 775 at 6; 776 at 3; 777 at 3; and 795 at 16.

Global required prospective Thai workers to post recruitment fees ranging from 300,000 to 1,020,000 Thai baht. ECF Nos. 780-25; 794 at 13; and 821 at 139. The EEOC provided declarations from Thai workers brought to work at Green Acre and Valley Fruit by Global that aver that at least several of the workers mortgaged

their houses in Thailand or incurred other large debts to pay the fees.  ECF Nos. 779-1 at 4 (Chao Amattat); 779-2 at 6 (Bunwan Chaidabot); 779-17 at 4 (Phiphop Khamkaeo); 779-20 at 4 (Marut Kongpia); 780-6 at 4 (Phaibun Manisaeng).  The same workers further attested that they believed based on Global's recruiters' representations that they would be able to earn enough money to pay back the debt within the first few months to one year of working and then continue to work at the promised wages for two additional years to save money to bring back to Thailand.  *See id.*  The EEOC does not provide evidence that the Growers were aware of the costs involved, the alleged promises by Global, or the recruitment process by Global.

When Global brought the Thai workers to the U.S. in 2004 and 2005, Global supervisors took the workers' passports.  *See* ECF Nos. 779-21 at 7; 782-8 at 4; 780-2 at 6.  The EEOC does not provide evidence that the Growers were involved with confiscating Thai workers' passports or were aware of the confiscation of the Thai workers' passports at any time prior to the conclusion of the Growers' contracts with Global.

### Evidence of Racial or National Origin Discrimination On or Off the Orchards

For purposes of these summary judgment motions only, and in order to avoid raising issues of fact that would bar resolution at the summary judgment stage, the Growers do not dispute that they were joint employers with Global with respect to

orchard-related matters. *See* ECF No. 774 at 33. In any case, the EEOC must show that Growers', or Global's, alleged discrimination or disparate treatment of the Thai workers was based on their race or national origin to satisfy an essential element for each of EEOC's claims. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) (the "ultimate question" in a racial disparate treatment claim is "whether . . . 'the defendant intentionally discriminated against [the plaintiff]' because of his race.") (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)); *Kang v. U. Lim Am., Inc.*, 296 F.3d 810, 817 (9th Cir. 2002) (plaintiff claiming hostile work environment based on race or national origin must show that he was subjected to unwelcome verbal or physical conduct "because of" his race or national origin). Therefore, the Court focuses on whether EEOC has provided sufficient evidence from which a reasonable jury could conclude that Global or the Growers discriminated against the Thai workers on the basis of race or national origin, when the evidence is viewed in the light most favorable to the EEOC.

The evidence supports that in addition to Blevins and Schwartz, Global employed orchard supervisors in Washington named Pranee Tubchumpol, Larry Collins, Sam Wongsesanit, Prinya Sangkarat, Joseph Knoller, as well as Cuevas, whose deposition is cited *supra*. ECF Nos. 775 at 8; 778-7 at 3; and 795 at 25. Global supervisors or crew leaders, who were Thai H-2A workers who spoke some English, served as interpreters for the Thai workers, who did not speak or understand English. ECF Nos. 778 at 7; 795 at 114; and 778-5 at 7. The evidence supports that

the Growers' owners and managers did not speak or understand Thai and relied totally on interpreters to communicate with the Thai workers. ECF Nos. 778-10 (Valley Fruit former Orchard Manager Alan Weaver recounting that the Thai workers were supervised by a Thai worker who spoke their language and that Valley Fruit management would communicate through the supervisor); 782-12 at 3−4 (Green Acre Owner and manager Morford recalling that neither he nor any Green Acre staff member in 2004 and 2005 could speak Thai); *see also* ECF Nos. 757 at 6; 782-24 at 52; and 795 at 156..

At the beginning of each work day, a Global supervisor or crew leader would get off the bus that transported the Thai Workers to either Green Acre's or Valley Fruit's orchards and enter the farm's office to receive the work assignment for the Thai workers for that day. *See* ECF Nos. 794 at 74−75. The Global supervisor or crew leader would receive a two-way radio to communicate with the farm managers or supervisors throughout the day. *See* ECF Nos. 782-24 at 152; 794 at 78. A farm manager or supervisor would tell the Global supervisor or crew leader that day's work assignment, which included the tasks to be completed, and the location that the Thai workers would be working that day. *See* ECF No. 821 at 42−43. Then, the Global supervisor or crew leader would re-board the bus and translate the day's instructions for the group. *See, e.g.,* ECF No. 779-2 at 12−13.

Some days the Thai work crews worked within proximity to non-Thai crews, and other days they were not within the non-Thai workers' vicinity. *See* ECF No. 782-24 at 105−06.

Ten of the Thai workers testified in declarations that Global supervisors either insulted them in Thai or otherwise spoke to them in Thai in a harsh, degrading, or derogatory manner. ECF No. 795 at 85−86. Global supervisor Chaiyot, who allegedly is from Bangkok originally and "not an Issan" person from Northern Thailand, allegedly commented on "how uneducated or poor" the Northern Thai workers were. ECF No. 779-21 at 9. There is also evidence that Global supervisor Chaiyot called some of the Thai workers "buffalo" or "monitor lizard" in Thai. *Id.*; *see also* ECF No. 782-16 at 28 (Thai worker Jare Cheuniaichon recalling Global supervisor Supachok using the Thai word for "monitor lizard" as an insult toward him). However, there is no evidence tying the Thai insults to any Growers supervisor, and not all of the alleged derogatory Thai comments were made while the Thai workers were working in Washington. *See* ECF No. 780-1 at 8 (Thai worker Arwuth Lainok declaring that a Global supervisor named "Sam" in Hawaii insulted some of the workers as "Issan" people, saying they were "uneducated" and "low class" and calling the Thai workers "buffalos or lizards as a group a number of times."). There is no evidence tying insults allegedly made in Hawaii to any of the Growers in this case, all of whom were solely situated in Washington State.

The declarations of some of the Thai workers also support that Global supervisors threatened to send the workers back to Thailand if they did not work hard enough or failed to meet work quotas. ECF No. 779-21 at 8. However, there is no dispute that the insults on or off the Growers' orchards were communicated in Thai. *See id.* Again, the evidence supports that the Growers' owners and managers did not speak or understand Thai and relied on interpreters to communicate with the Thai workers. ECF Nos. 778-10; 782-12 at 3−4.[3]

With respect to Growers' owners and managers, it is undisputed that, through translators, they conveyed various feedback to the workers between summer and fall 2005, including multiple admonitions to "hurry up," and instructions about how to pick fruit without bruising the fruit or damaging the tree. *See* ECF No. 821 at 171−73.

There is evidence that off orchard, Global personnel threatened or intimidated the Thai workers and retained their passports, provided deficient housing and inadequate food, and transported the Thai workers to the orchards in crowded vehicles. *See* ECF No. 822 at 29−61. However, the Growers do not concede, even

---

[3] The Court notes that the EEOC changes its position on whether the EEOC disputes the Growers' managers' ability to speak or understand Thai. *Compare* ECF No. 795 at 157 (asserting that Valley Fruit manager Kirk Dunn "does not explicitly testify that he does not speak Thai and states that you could communicate with the Thai workers through the supervisors") *with* ECF No. 757 at 6 ("Dunn asserts the Thai Claimants never complained about the Road G housing, but Dunn cannot speak Thai . . . .").

for purposes of this summary judgment, that they were joint employers for purposes of off-orchard work.

There is no dispute that only Thai workers were employed as foreign guest workers at the Growers' farms under the H-2A program. *See* ECF Nos. 826 at 45; 794 at 9. However, Global also employed domestic workers through the H-2A program, and Growers directly employed domestic workers. ECF Nos. 776 at 4; 777 at 3. The domestic workers, whether hired by Global or the Growers directly, were not entitled to non-wage benefits such as housing or transportation. ECF Nos. 795 at 40; 778-4 at 4. Therefore, the H-2A Thai workers were housed together, transported to and from work together, and were supervised by individuals who spoke Thai. *Id.*

Schwartz, Global's on-site supervisor, recalled that a team of security guards parked their vehicles around a hotel at which the Thai workers for both Growers' farms were housed. ECF No. 758-3 at 5–6. The EEOC alleges that the purpose for the security team was to "prevent the Thai workers from running away." *Id.*

There is evidence that Global subjected the Thai workers to a variety of house rules, including imposing a curfew, restricting consumption of alcohol, and conducting head counts. *See* ECF No. 780-1 at 7. Some of the Thai workers recall in their declarations that Global supervisors "Pranee, Chaiyot, and Charlie" threatened to send workers back to Thailand or transfer them to another farm earning less money if they complained, tried to escape, failed to obey, or missed the daily head count. ECF Nos. 779-2 at 10; 779-12 at 7; 779-13 at 8; and 779-21 at 8. It is

undisputed that, in one instance, Global supervisor Blevins had a gun that he placed on a table in front of several of the Thai workers while he threatened to send a worker back to Thailand.  ECF No. 822 at 39 (citing ECF Nos. 621-1; 491-8; and 549-4).  There is no evidence that Growers' owners or managers were present or aware of that incident.

There is evidence that Global employed an individual named "Joseph" as a security guard posted outside the workers' living quarters who informed at least some Thai workers that he was ex-law enforcement and that he would send them to jail or back to Thailand if they escaped.  *See* ECF No. 548-13 at 20, 36; 782-16 at 15.  It is unclear from those sources whether Joseph spoke Thai or if his statements were translated by someone else for the Thai workers.  *See id.*

The EEOC has submitted declarations from the Thai workers attesting to a variety of issues with their housing while working at Green Acre and Valley Fruit, including overcrowding, unsanitary conditions, and inadequate access to cooking facilities.  ECF No. 822 at 44−48 (citing approximately 81 declarations in the record submitted before and after the Ninth Circuit's remand).  The Growers object that the "declarations consist of mere allegations and conclusory statements."  *Id.* at 47.

One Valley Fruit manager, Dirk Dunn, visited the "Road G" housing, where a portion of the Thai workers were living, "a couple of times."  ECF No. 821 at 202.  Dunn testified that, when he learned that the Thai workers living at that location were buying rice in "little packages," he bought one hundred pounds of rice at

Costco and then sold it to the Thai workers at cost. ECF Nos. 782-20 at 8; 821 at 204. However, Dunn did not testify that the Thai workers informed him of any issues with their access to food. *See id.* There is no other evidence that any of the Growers were aware of any of the living conditions or how any of the other H-2A requirements were being satisfied.

There also is evidence that Global transported the Thai workers to the orchards in buses that some of the Thai workers attested were overcrowded, and, therefore, unsafe. *See* ECF No. 822 at 83−85. It is undisputed that Green Acre owner and a Green Acre manager saw Thai workers arrive at the orchards in buses. ECF No. 822 at 86 (citing ECF Nos. 718-15; 719-9). However, the EEOC did not provide evidence that the Growers had knowledge that the transportation was overcrowded, and, as a result, unsafe. *See* ECF No. 822 at 89.

### *Thai Workers Who Left Global*

In response to the Growers' comprehensive Motion for Summary Judgment, the EEOC argues that they raise constructive discharge claims on behalf of eleven Thai workers. ECF No. 793 at 66.

Chao Amattat, who worked at Valley Fruit and Green Acre from late June to early October 2005, left "[d]uring the Fall of 2005 . . . because [he] had not been paid for three weeks." ECF No. 485-1 at 4, 8. Amattat further declared, "I sought work elsewhere in the U.S. because I needed to pay off my large debts and support my family back in Thailand." *Id.*

Bunchuai Chanaphai, who worked at Valley Fruit, recalled: "In about November 2005, Global supervisor Larry told us there was no more work at Valley Fruit. He said Global would transfer us to either Utah or Hawaii. Global constantly lied to us that I did not know if this was another one of their lies. I did not know if they would deport or transfer us to another farm or if there would be work for us." ECF No. 620-5 at 8.

Jare Cheuniaichon, who worked at Green Acre in 2004 and Valley Fruit as well as other farms in 2005[4], left Global at an unspecified date in 2005 because he alleged that he was not provided with sufficient work hours and did not get paid. ECF No. 548-13 at 37.

Cheotchai Chumphang, who worked at Green Acre, "escaped from the farm for fear of being deported back to Thailand or being sent to another farm making less money." ECF No. 485-6 at 7.

Laphit Khadthan,[5] who worked at Valley Fruit from June to October 2005 and at Green Acre in September 2005, left Global in October 2005, explaining in his 2012 deposition that Global had informed him he would be transferred to Hawaii. ECF No. 782-18 at 16. He feared being sent back to Thailand instead and had heard

---

[4] Cheuniaichon testified that he worked on different farms in 2005 and that he did not know who owned the farms he worked on. ECF No. 548-13 at 12.

[5] This claimant's name is spelled alternatively as "Khadthan," ECF No. 778-11 at 3, and "Khodthan," ECF No. 782-18 at 2. The Court uses a single spelling for consistency.

through a friend that the work in Hawaii was "very heavy duty" and insufficient. *Id.* at 17.

Marut Kongpia, who worked at Valley Fruit, described having "no choice but to escape in November 2005" "[b]ased on the physical threat by Charlie [Blevins] when he appeared at the Thai worker house with guns, repeated threats by Pranee to send us back to Thailand if we did not work hard enough, and their failure to pay me for work that I had performed at Valley Fruit . . . ." ECF No. 485-9 at 7.

Duangkaew Khongchai, who worked at Valley Fruit, "escaped in October 2005 because [he] found out that Global was going to send me back to Thailand and I needed to continue earning wages in the U.S. to support my family and pay my debts." ECF Nos. 621-1 at 5, 11. Furthermore, "I also had not been paid for about three weeks of work." *Id.*

Khamin Yanlaha, who worked at Green Acre, recounted: "Working in Washington gave me a lot of anxiety. Work was not steady and there were days when we could not work . . . I worried about paying my debt. My family was also stressed out because creditors sent letters to my house in Thailand demanding money and I did not have money to send my family to help. By the end of October, I could not take the stress anymore. My hours were reduced because there was less work, and I was afraid of what would happen when the apples ran out because I had a large amount of debt to pay." ECF No. 782-10 at 8−9.

Tawee Metha, who worked at Valley Fruit, "left . . . because [he] was not being paid and [he] desperately needed to pay off [his] large debts and support [his] family back in Thailand." ECF No. 622-3 at 10.

Jantha Sripakho, who worked at Green Acre in 2004 and returned to Washington with Global in August 2005, maintained that Global stopped giving him work at Green Acre "after about three months," so he "waited for about five days, but Global gave [him] no more work." ECF No. 623-4 at 4, 8, and 10. He feared "Global would send [him] back to Thailand again, so [he] escaped . . . ." *Id.* at 10.

The EEOC submitted no evidence to connect the Growers to any of the alleged hardships suffered or to support that the alleged hardships were on the basis of race or national origin.

### *EEOC Complaint Process and Investigation*

In April 2006, Khadthan, who had worked at Green Acre, and Kongpia, who worked at Valley Fruit, filed charges of discrimination with EEOC, each contending that he was discriminated and retaliated against on the basis of his national origin. ECF Nos. 778-11 and 778-12. One hundred more charges of discrimination subsequently were filed by Thai workers, 72 as to Green Acre and 28 as to Valley Fruit. ECF No. 778-13 at 9. EEOC's investigation and conciliation process terminated around September 2010. ECF Nos. 778-23 and 778-24.

/ / /

/ / /

### *Other Litigation and Investigations*

The Growers have been involved in other litigation related to the Thai workers' work in their orchards. On that topic, the EEOC asks the Court to take judicial notice of the district court's Findings of Fact and Conclusions of Law filed on April 15, 2009, in the case of *Perez-Farias, Sanchez, and Betancourt v. Global Horizons, Inc., et. al* ("*Perez-Farias*"); Case No. 05-CV-3061-RHW, in the United States District Court, Eastern District of Washington, at ECF No. 1083, and the Settlement Agreement and Stipulation of the Parties between Global Horizon, Inc., Department of Labor and Industries, and Employment Security Department executed September 22, 2005, in *Perez-Farias*, Case No. 05-CV-3061-RHW, at ECF No. 467-3. ECF No. 729. EEOC offers these exhibits "to show notice of the Grower-Defendants' knowledge of Global's violations of various federal and Washington state laws, including but not limited to Global's non-compliance with the H2-A [sic] program." *Id.* at 5–6.

The Court takes judicial notice of the existence and contents of the *Perez-Farias* court's Findings and Conclusions and the Settlement Agreement, but not of the truth of any assertions therein. *See* Fed. R. Evid. 201; *Wyatt v. Terhune*, 315 F.3d 1108, 1114 (9th Cir. 2003) ("taking judicial notice of findings of fact from another case exceeds the limits of Rule 201"), *overruled in other part by Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014); *Hayes v. Woodford*, 444 F. Supp. 2d 1127, 1136–37 (S.D. Cal. 2006) (recognizing that a court may also take judicial

notice of other courts' proceedings if they "directly relate to matters before the court.").

As Growers emphasize, *Perez-Farias* was a case against Global and Growers that included allegations of treatment that discriminated against local Hispanic workers and favored the Thai workers. *See* ECF Nos. 793 at 33; 759 at 5. That is the opposite of EEOC's current allegations. The Court notes that *Perez-Farias* was decided in 2009 and the events in this case occurred in 2004-05. Therefore, the Growers could not have received notice from a decision that occurred four to five years after the underlying events in this case occurred.

In addition, the EEOC points out that Global did not have a farm labor contractor license from the State of Washington when it began performing work on Growers' farms in 2004 and was investigated by Washington State's Department of Labor and Industries ("L&I") in both 2004 and 2005. *See* ECF No. 782-23 at 4, 15. However, the L&I investigator did not make any determinations whether Global followed state or federal discrimination laws. *Id.* at 15. The L&I investigator also did not share any of his findings regarding his investigations of Global with the Growers. *Id.* at 16. Ultimately, L&I, along with the Washington State Employment Security Department, entered into a settlement with Global, which included stipulated admissions that Global failed to provide legally required disclosures and that it withheld wages from its employees, both Thai and non-Thai, for a non-existent State income tax. ECF No. 778-1 at 3. The fact that Global admitted that it

withheld wages from both Thai and non-Thai workers does not support the EEOC's theory that Global's actions were on the basis of race or national origin.

The EEOC also contends that the Growers failed to investigate independently any of the Thai workers' claims. The evidence supports the conclusion that neither Green Acre nor Valley Fruit conducted any independent investigation after learning of the investigation by L&I approximately mid-summer 2004 and again in approximately mid-summer 2005. ECF No. 725-14 at 5−9, 18−19.

### Litigation

The EEOC initiated this litigation by filing its original Complaint, ECF No. 1, on April 19, 2011. On March 20, 2012, the EEOC filed its First Amended Complaint, ECF No. 141, alleging a claim under Title VII that the Growers and Global engaged in a pattern-or-practice of discriminatory treatment and a hostile work environment because of national origin (Thai) and race (Asian), retaliation, and constructive discharge.

On July 27, 2012, the Court partially dismissed the EEOC's First Amended Complaint on the grounds that the Growers could only be liable as a joint employer for "orchard related" Title VII violations and that the First Amended Complaint failed to allege sufficient facts to support separate claims of national origin discrimination against the Growers. ECF No. 178. On May 28, 2014, the Court granted a joint, comprehensive motion for summary judgment by the Growers and dismissed all claims against them. ECF No. 582. On March 19, 2015, the Court

granted Growers' motion for attorneys' fees as prevailing parties under Title VII, determining that: "[T]he EEOC['s] . . . Title VII claims against the Grower Defendants were baseless, unreasonable, and frivolous." ECF No. 614 at 24.

On appeal, the Ninth Circuit found that the Court had erred "by dismissing the EEOC's disparate treatment claim (and the related pattern-or-practice claim) on the ground that the Growers were not joint employers of the Thai workers as to non-orchard-related matters." *U.S. Equal Employment Opportunity Commission v. Global Horizons, Inc. et al* ("*Glob. Horizons*"), 915 F.3d 631, 642 (9th Cir. 2019). The EEOC did not appeal the dismissal of the retaliation claim. *Id.* However, the Ninth Circuit determined that the EEOC had plausibly alleged Green Acre's liability under Title VII for non-orchard-related matters. *Id.* As to Valley Fruit, the Ninth Circuit found that it could not "affirm the district court's dismissal of the EEOC's allegations against Valley Fruit with respect to non-orchard-related matters." *Id.*

The Ninth Circuit reversed the July 27, 2012 order of dismissal, the May 28, 2014 summary judgment order, the March 19, 2015 attorney's fees order, and an order in which the Court had denied the EEOC's motions to compel discovery regarding the Growers' liability with respect to non-orchard related matters. *Glob. Horizons*, 915 F.3d at 642−43. The Ninth Circuit instructed the Court to allow the EEOC to amend its complaint on remand "with respect to Valley Fruit's liability as to non-orchard-related matters." *Id.* at 642. The Ninth Circuit directed this Court to consider claims raised by the EEOC in an amended complaint filed after remand "in

light of evidence regarding both orchard-related and non-orchard-related matters."

*Id.* at 642−43.

Upon remand, the EEOC filed a Second Amended Complaint on June 3, 2019. EEOC's Second Amended Complaint claims that Global and Green Acre, and Global and Valley Fruit, subjected Kongpia and Khadthan, and similarly situated "Thai and/or Asian" employees, to a pattern or practice of disparate treatment, a hostile work environment, and constructive discharge on the basis of national origin and/or race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-5 ("§ 706") and 2000e-6 ("§ 707"). *See* ECF No. 705 at 2, 83−95. Section 706 authorizes the EEOC to sue on behalf of one or more "persons aggrieved" by an unlawful employment practice. 42 U.S.C. § 2000e-5(f). Section 707 empowers the EEOC to investigate and act on a charge of a pattern or practice of discrimination. 42 U.S.C. § 2000e-6.

On February 18, 2015, after the Court had dismissed the Growers as Defendants at summary judgment and before that summary judgment decision was reversed on appeal, Global and the EEOC stipulated to entry of a default judgment against Global. ECF No. 609; *see also* ECF Nos. 667 and 679. The default judgment orders were not disturbed by the Ninth Circuit's decision. Therefore, Global is not a defendant in the current litigation.

/ / /

/ / /

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

Courts evaluate cross-motions for summary judgment separately under the same standard. *Am. Civil Liberties Union of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323. On an issue where the non-moving party will bear the burden of proof at trial, the moving party can prevail by showing that the non-moving party lacks evidence to support its case. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). If the moving party meets its initial burden, the opposing party must then set out "specific facts" showing a genuine issue for trial in order to defeat the motion. *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). The opposing party's evidence

must be more than "merely colorable" and must be "significantly probative." *Id*. at 249−50.

# DISCUSSION

### *Pattern-or-Practice of Disparate Treatment, Hostile Work Environment, and Constructive Discharge*

By the language of its Second Amended Complaint, the EEOC pursues liability via a pattern-or-practice theory for a disparate treatment, a hostile work environment, and a constructive discharge claim, all on the basis of national origin and/or race under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-5 ("§ 706") and 2000e-6 ("§ 707"). *See* ECF No. 705 at 2 (Second Amended Complaint); *see also* ECF Nos. 686 (Slip Opinion) and 692 (Mandate).

However, in response to the Growers' comprehensive summary judgment motion before the Court, the EEOC argues that its prima facie case hostile work environment and disparate treatment claims are based on a pattern-or-practice theory, while asserting that its constructive discharge claim concerns eleven individual claimants, which conflicts with the EEOC's allegations in its Second Amended Complaint. ECF Nos. 793 at 66 (Plaintiff's response asserting eleven individual constructive discharge claims); 826 at 40 (Growers' oral argument against the constructive discharge claims for eleven individuals); *but see* ECF Nos. 705 at 83 (Second Amended Complaint stating only a pattern-or-practice constructive discharge claim); 747 (Plaintiff's partial summary judgment motion seeking a

determination of the Growers' liability for the disparate treatment, hostile work environment, and constructive discharge claims, all on a pattern-or-practice theory).

The Growers cross-move for summary judgment on all of the EEOC's claims including disparate treatment, hostile work environment, and constructive discharge, whether pursued on a pattern-or-practice or individual basis. ECF No. 774.

<u>Pattern-or-Practice Claims under Sections 706 and 707 of Title VII</u>

Section 706 of Title VII authorizes the EEOC to sue on behalf of one or more "persons aggrieved" by an unlawful employment practice. 42 U.S.C. § 2000e-5(f). Section 707 empowers the EEOC to investigate and act on a charge of a pattern or practice of discrimination, even where no individual has filed a charge. 42 U.S.C. § 2000e-6; *see also Serrano v. Cintas Corp.*, 699 F.3d 884, 896 (6th Cir. 2012) (". . . § 707 permits the EEOC to initiate suit without first receiving a charge filed by an aggrieved individual, as it must when initiating suit under § 706."). The remedies available under §§ 706 and 707 differ. Compensatory and punitive damages are available for claims brought under § 706. *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 287 (2002) (quoting 42 U.S.C. § 1981a(a)(1)). By contrast, § 707 provides for equitable relief only. *See EEOC v. Bass Pro Outdoor World, LLC*, 865 F.3d 216 (5th Cir. 2017).

Growers asserted in their partial summary judgment motion that although the Ninth Circuit has not ruled on the EEOC's burden when prosecuting a Section 706, 42 U.S.C. § 2000e-5(f), hostile work environment claim on behalf of multiple

claimants, "courts in the Ninth Circuit and others have historically analyzed the EEOC's hostile work environment claims on a Claimant-by-Claimant basis. *See* ECF No. 710 at 11 (citing *EEOC v. Love's Travel Stops & Country Stores, Inc.*, 677 F. Supp. 2d 1176, 1187 (D. Ariz. 2009); *EEOC v. GLC Rests., Inc.*, 2006 WL 3052224 (D. Ariz. Oct. 26, 2006); *EEOC v. Swissport Fueling, Inc.*, 916 F. Supp. 2d 1005, 1020-21 (D. Ariz. 2013)). However, the Court finds persuasive authority to support that a hostile work environment claim based on a pattern-or-practice theory is cognizable under either § 706 or § 707. *See Serrano v. Cintas Corp.*, 699 F.3d 884, 896 (6th Cir. 2012), *cert. denied,* 134 S. Ct. 92 (2013); *EEOC v. Mavis Disc. Tire, Inc.*, 129 F. Supp. 3d 90, 106−09 (S.D.N.Y. 2015); *EEOC v. Pitre, Inc.*, 908 F. Supp. 2d 1165 (D.N.M. 2012).

Title VII provides that it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or national origin." 42 U.S.C. § 2000e-2(a)(1).

An "employer" under Title VII is "a person engaged in an industry affecting commerce who has fifteen or more employees . . . an any agent of such a person." *Id.* § 2000e(b). The Ninth Circuit, in the appeal of this case, held that courts must apply the common-law agency test to determine whether there is an employee-employer relationship. *Glob. Horizons*, 915 F.3d at 639. The common-law agency test is a fact-intensive inquiry in which "the principal guidepost" is the element of

control, meaning "the extent of control that one may exercise over the details of the work of the other." *Clackamas Gastroenterology Associates, P.C. v. Wells*, 538 U.S. 440, 448 (2003) (internal quotation omitted); *see also Glob. Horizons*, 915 F.3d at 639.

Title VII suits alleging intentional discrimination may proceed according to the *McDonnell Douglas* method of proof, under which the plaintiff can establish a prima facie case of individual discrimination by presenting evidence that he or she (1) is a member of a protected class; (2) is qualified for the job; (3) suffered an adverse employment decision; and (4) was treated differently than similarly-situated non-protected employees because of plaintiff's protected characteristic. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 n. 4 (1973) (Title VII prohibits an employer from terminating or otherwise discriminating against an employee "because of such individual's race . . . or national origin . . . ."); *see also, e.g., Nicholson v. Hyannis Air Serv.*, 580 F.3d 1116, 1123 (9th Cir. 2009).

However, in *Teamsters*, a §706 class action case, the Supreme Court identified "another means by which a Title VII plaintiff's initial burden of proof can be met." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 (1977), *abrogated on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011); *see also Celestine v. Petroleos Venez. SA*, 266 F.3d 343, 355 (5th Cir. 2001) ("A pattern or practice case is not a separate and free-standing cause of action. . . , but is really 'merely another method by which disparate treatment can be shown.'") (quoting

*Mooney v. Aramco Servs., Co.*, 54 F.3d 1207, 1219 (5th Cir. 1995)).  A pattern-or-

practice method of proving discrimination is available to the government and class-

action plaintiffs.  *Dukes*, 564 U.S. at 352, n. 7.

Proceeding on a pattern-or-practice theory, a plaintiff must show by a

preponderance of the evidence that "racial discrimination was the company's

standard operating procedure[,] rather than the usual practice."  *Teamsters*, 431 U.S.

at 336.  At the first step, a plaintiff is "not required to offer evidence that each person

for whom it will ultimately seek relief was a victim of the employer's discriminatory

policy."  *Id.* at 360; *see also Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095,

1105 (10th Cir. 2001) ("[T]he initial focus in a pattern-or-practice case is not on

individual employment decisions, 'but on a pattern of discriminatory decision

making.'" ) (quoting *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 876

(1984)).  Rather, a plaintiff must "establish a prima facie case that such a policy

existed."  *Id.*

Disparate treatment claims require a showing that the "employer has treated

that particular person less favorably than others because of the plaintiff's race, color,

religion, sex, or national origin."  *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977,

985−86 (1986) (describing a disparate treatment claim as "'the most easily

understood type of discrimination.'") (quoting *Teamsters*, 431 U.S. at 335, n. 15).

Disparate treatment occurs "when an individual alleges that an employer has treated

that particular person less favorably than others because of the plaintiff's race, color,

religion, sex, or national origin." *Watson*, 487 U.S. at 985−86. Where a plaintiff seeks to show systemic discrimination by an employer, "[t]he ultimate factual issues are . . . simply whether there was a pattern or practice of such disparate treatment and, if so, whether the differences were 'racially premised.'" *Teamsters*, 431 U.S. at 335. Disparate treatment claims, "[b]y their very nature . . . require proof of intentional discrimination." *Gay v. Waiters' and Dairy Lunchmen's Union*, 694 F.3d 531, 537 (9th Cir. 1982).

To make out a claim of a hostile work environment based on race, a plaintiff must present evidence that: "(1) the defendants subjected [him or her] to verbal or physical conduct based on her race; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment." *Surrell v. California Water Service Co.*, 518 F.3d 1097, 1108 (9th Cir. 2008). A plaintiff must demonstrate not only that he or she found the workplace subjectively hostile to individuals of his or her race, or, alternatively, his or her national origin, but that the workplace objectively was hostile from the perspective of a reasonable person. *Davis v. Team Electric Co.*, 520 F.3d 1080, 1095 (9th Cir. 2008).

A court examining a record for evidence on whether a workplace is objectively hostile must consider "all the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes

with an employee's work performance.'" *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). "No single factor is required, and the required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct." *Id.* (internal quotations omitted).

If the plaintiff establishes its prima facie case, the burden "shifts to the employer to defeat the prima facie showing of a pattern or practice by demonstrating that the government's proof is either inadequate or insignificant . . . ." *Id.*; *see also Dukes*, 131 S. Ct. at 2552, n. 7, 2561. At the second step of a pattern-or-practice claim, the employer seeking to rebut the presumption of discrimination need only "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). Otherwise stated, the employer's burden is "to defeat the prima facie showing of a pattern or practice by demonstrating that the Government's proof is either inaccurate or insignificant." *Teamsters*, 431 U.S. at 360.

<u>Evidence of Discrimination</u>

Whether examined under the pattern-or-practice model or individual claimant model, both disparate treatment and hostile work environment claims require a showing that the offensive treatment or conduct was "based on" the plaintiff's race or national origin. *See Watson*, 487 U.S. at 985−86.

The EEOC's claims are based on a theory that Global schemed with the Growers to expressly seek Thai workers to bring to the orchards as a captive,

compliant workforce, and treated them badly in comparison to non-Thai workers once the Thai workers were there. *See* ECF No. 793 at 42, 49, 55; 826 at 51−53.

The EEOC does not offer any evidence of discriminatory acts by the Growers themselves and instead proffers Global's actions to support a prima facie case of a pattern or practice of disparate treatment and a hostile work environment.

The EEOC offers evidence supporting that Global subjected the Thai H-2A workers to isolation, substandard housing conditions, inadequate access to food, and unsafe transportation. *See* ECF Nos. 822 at 29−61; 795 at 85−86. The Growers maintain that the record supports that Global mistreated all of its employees under the H-2A program, both the Thai workers and the domestic workers, by failing to pay the employees what they were owed. ECF No. 819 at 15. The Growers further concede that the record contains evidence that "Global threatened its employees and used intimidating tactics, that it recruited many of the Claimants with false promises of continued employment in the United States, took possession of Claimants' passports, provided inadequate housing and food, and transported Claimants to work on crowded buses." *Id.*; *see also* ECF No. 821 at 110−43. However, the Growers argue that Global's treatment of employees was not based on race or national origin. The Growers argue that Global's treatment applied to all of its employees regardless of race or national origin.

A Title VII plaintiff may demonstrate discrimination through either direct or indirect, i.e., "circumstantial" evidence. *United States Postal Service v. Aikens*, 460

U.S. 711, 714, n. 3 (1983).  In a case in which the plaintiff has alleged that the

employer "has engaged in a 'pattern or practice' of discrimination, 'statistical data is

relevant because it can be used to establish a general discriminatory pattern . . . .'"

*Obrey v. Johnson*, 400 F.3d 691, 694 (9th Cir. 2005) (quoting *Diaz v. Am. Tel.*, 752

F.2d 1356, 1363 (9th Cir. 1985)).  "For purposes of Title VII, 'where gross statistical

disparities can be shown, they alone may in a proper case constitute prima facie

proof of a pattern or practice of discrimination.'"  *Coral Constr. Co. v. King Cty.*,

941 F.2d 910, 918 (9th Cir. 1991) (quoting *Hazelwood Sch. Dist. v. United States*,

433 U.S. 299, 307−08 (1977)).  "Like statistical evidence, anecdotal evidence of past

discrimination can be used to establish a general discriminatory pattern in an

employer's hiring or promotion practices."  *Obrey*, 400 F.3d at 698.

     Even accepting the EEOC's proffered evidence of poor conditions and

treatment of the Thai workers by Global, the EEOC has two problems to overcome.

First, the EEOC does not present any statistical evidence of disparity in this matter

because there is no appropriate comparator group, and second, Global is not a party

in this case.

### No Comparator

     EEOC argues that the "Mexican" or "Hispanic" workers were better treated

than the Thai workers.  *See, e.g.,* ECF No. 793 at 29.  However, the EEOC does not

dispute that Global did not, and was not required to, provide housing, food

allowances, or transportation to the Hispanic workers who worked for Global and

Growers during the same time period, or to any group other than the Thai workers. *See* ECF No. 826 at 53. Nor does the EEOC show that the Thai workers were paid less than local H-2A workers. *See* ECF Nos. 800-1, 800-2. With no group with which to compare the Thai workers statistically, the EEOC relies entirely on anecdotal evidence to connect the poor conditions and threatening or intimidating treatment to race or national origin, despite the critical importance of showing a causal connection between the discriminatory action and the protected characteristic for both the disparate treatment and hostile work environment claims. *See St. Mary's Honor Ctr,* 509 U.S. at 511; *Kang*, 296 F.3d at 817.

The EEOC relies on the 2013 deposition testimony of Cuevas, replicated extensively above, to anchor any pattern or practice of behavior that the EEOC otherwise shows to the Thai workers' race or national origin. *See* ECF No. 826 at 53. The EEOC relies on Cuevas' testimony to assert that Global's managers, Orian and Schwartz, expressed discriminatory stereotypes of Thai people, as compared to Hispanic people. The EEOC attempts to lasso Global's actions to the Growers through Cuevas' testimony that the owners of Valley Fruit and Green Acre both affirmed Orian and Schwartz's statements of discriminatory stereotypes through a nod of Verbrugge's head or vague statements that Cuevas attributed to Morford.

The Growers object that the Cuevas testimony is inadmissible hearsay, and that there is no competent evidence to support any racial animus by Global. ECF No. 819 at 10; *see also* Fed. R. Civ. P. 56(c)(2) ("A party may object that the

material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").

Hearsay, in relevant part, is a "statement," meaning "a person's oral assertion . . . or nonverbal conduct, if the person intended it as an assertion" that is made out of court and is offered "to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801. In addition, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see also* Fed. R. Evid. 602 (requiring a party to introduce evidence "sufficient to support a finding that the witness has personal knowledge of the matter"). A district court abuses its discretion if it considers evidence in support of summary judgment that is inadmissible hearsay or is not made on personal knowledge. *See Block v. City of L.A.*, 253 F.3d 410, 419 (9th Cir. 2001); *see also Himaka v. Buddhist Churches of America*, 917 F. Supp. 698, 704 (N.D. Cal. 1995) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment."). Evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence"; and "the fact is of consequence in determining the action." Fed. R. Evid. 401.

Cuevas' deposition is rife with evidentiary problems. First, the proffered testimony is from a 2013 deposition. Therefore, it is an out of court statement.

Although the EEOC argues that it is not offered for the truth of the matter asserted, the Court finds that the Cuevas' testimony must be offered for the truth of the matter asserted: that Orian and Schwartz made statements expressing stereotypes about Thai workers in front of Verbrugge, Morford, and Cuevas. If the Court removes the truth of the assertion, that Orian and Schwartz made statements expressing stereotypes about Thai workers in front of Verbrugge, Morford, and Cuevas, then Cuevas' testimony has no probative value and would be inadmissible as irrelevant. Therefore, to be admissible as relevant evidence, the EEOC must be offering Cuevas' testimony for the truth of the matter asserted, and Cuevas' testimony about Orian and Schwartz's alleged statements is hearsay.

In order to be admissible hearsay, Cuevas' testimony must meet a hearsay exception or exclusion. *See* Fed. R. Evid. 802. The EEOC proffers that Cuevas' testimony is an admission of a party opponent under Fed. R. Evid. 801(d)(2). A statement is not hearsay under Rule 801(d)(2) if the statement must be "offered against an opposing party and: (A) was made by the party in an individual or representative capacity; (B) is one the party manifested that it adopted or believed to be true; (C) was made by a person whom the party authorized to make a statement on the subject; (D) was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or (E ) was made by the party's coconspirator during and in furtherance of the conspiracy. . . ." Fed. R. Evid. 801(d)(2).

The subsection of 801(d)(2) on which the EEOC relies is unclear because they offered no foundation either in their briefing or at oral argument as to how Cuevas' testimony about Orian's and Schwartz's statements qualify as an admission of a party opponent. In fact, it appears that Cuevas' testimony explicitly does not qualify as an admission of a party opponent. First, Cuevas was a Global employee, and Global is not a party in this litigation. There is no evidence that Cuevas ever was an employee of Growers, who are the defendants in this case.

Second, there is no evidence that Cuevas himself was ever a party to the litigation, nor any evidence that Cuevas had the authority to testify in a representative capacity. *See* Fed. R. Evid. 801(d)(2)(A). Third, there is no evidence that the party, in this case the Growers, "manifested or adopted or believed to be true" Cuevas' testimony that Orian and Schwartz made statements. Fed. R. Evid. 801(d)(2)(B). Similarly, there is no evidence that the Growers, or even Global, ever "authorized" Cuevas to make a statement about Orian's and Schwartz's alleged statements. 801(d)(2)(C). Nor is there any evidence that Cuevas' testimony was made as the Growers', or even as Global's, "agent or employee on a matter within the scope of that relationship and while it existed; . . . ." Fed. R. Evid. 801(d)(2)(E).

The last possible option under Rule 801(d)(2) is a statement "made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). EEOC intimates there was a conspiracy between Global and Growers to hire Thai workers and to bring them to Washington in order to abuse them.

However, EEOC proffers no evidence for the alleged conspiracy other than Cuevas'

challenged testimony about statements made by Orian and Schwartz.  As the federal

rules note: "The statement must be considered but does not by itself establish the

declarant's authority under (C); . . . or the existence of the conspiracy or

participation in it under (E)."  Fed. R. Evid. 801(d)(2).  Therefore, this Court

considers Cuevas' testimony that Orian and Schwartz made statements, but without

more, cannot find that Cuevas or Global were coconspirators with Growers, or even

that any conspiracy existed.  Therefore, Cuevas' testimony is not excluded from the

hearsay rule under Rule 801(d)(2) as an admission of a party opponent.  Cuevas'

testimony is hearsay that is inadmissible unless it meets an exception, which the

Court does not find.

Moreover, the Growers object to a second level of hearsay regarding Cuevas'

statements about Orian, Schwartz, Verbrugge, and Morford.  *See* ECF No. 826 at

100−01.  Even if the Court accepted the EEOC's argument that Cuevas should be

considered a party opponent for purposes of this summary judgment, which the

Court does not, Cuevas' allegations in his 2013 deposition about statements by

Orian and Schwartz would need to qualify under some other exception, as they

would be hearsay within hearsay.  At oral argument, the EEOC argued that the

statements by Orian and Schwartz were not being offered to prove the truth of the

matter asserted, but rather were being offered under Fed. R. Evid. 803(3) as

reflecting the speaker's then-existing mental state.  *Id.* at 99.  Specifically, the EEOC

proffered that the comments regarding stereotypes that Thai workers work harder in worse conditions and with less complaining than Hispanic workers were offered to show a discriminatory plan, not for the truth of the stereotypes themselves. *Id.*

Rule 803(3) creates a state of mind exception to the rule against hearsay for a "declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will." Fed. R. Evid. 803(3). If the Court removes the statements regarding the stereotyped value or characteristics of Thai workers or Hispanic workers, only statements regarding hiring workers remain. None of Orian or Schwartz's statements, without being offered for the truth of the matter asserted, provide any probative value for the EEOC's burden to prove disparate treatment or hostile work environment on the basis of race or national origin. In showing "state of mind" under Fed. R. Evid. 803(3), the statements only show that the men intended to hire workers.

Moreover, even if the Court were to accept the EEOC's argument that the alleged statements by Orian and Schwartz were statements of their "then-existing state of mind," the statements cannot be considered, because they rely on Cuevas' testimony as a conduit. As previously discussed, Cuevas' testimony is inadmissible hearsay. Therefore, the statements by Orian and Schwartz are hearsay within

hearsay and not admissible, as the conduit for those statements, Cuevas' testimony, is not admissible.

The EEOC also seeks to rely on hearsay within hearsay to prove the Growers' racial animus in the form of Verbrugge's alleged "nod" and Morford's unspecified gesture or statement of affirmation. ECF No. 801-10 at 13 (Cuevas describing Verbrugge "kind of nodding like indicating an agreement" with Schwartz's statement), 16 (Cuevas stating only "Morti said it. And Mr. Morford affirmed it[,]" without specifying how Morford allegedly expressed agreement). A nonverbal gesture qualifies as a statement under the hearsay rule if the conduct is intended as an assertion. Fed. R. Evid. 801(a). Verbrugge's alleged "nod" and Morford's alleged affirmation were made out of court.

The EEOC is offering the alleged "nod" and affirmation as evidence that Verbrugge and Morford agreed with the statements that Orian and Schwartz made, as reported by Cuevas in his testimony. *See* ECF No. 826 at 98. Cuevas also testified to numerous other statements that Morford allegedly made expressing agreement with Orian's stereotyped views of Thai workers. ECF No. 801-10 at 18–23. Therefore, the EEOC is offering Cuevas' testimony about the "nod," Morford's unspecified affirmation, and Morford's statements, to prove the truth of the matter asserted: that Verbrugge, owner of Valley Fruit, and Morford, the owner of Green Acre, agreed with statements made by Orian and Schwartz and were complicit in having racially stereotyped thoughts about Thai workers. Therefore, the

"nod," Morford's unspecified affirmation, and Morford's unknown statements qualify as hearsay within hearsay that relies on the admissibility of Cuevas' testimony to be admissible. As the Court has found that Cuevas' testimony is inadmissible hearsay, both levels of hearsay-within-hearsay fail to be admissible.

Even if the Court examines the admissibility of Cuevas' testimony under 807, the residual hearsay exception, Cuevas' testimony fails to be admissible. Fed. R. Evid. 807 allows hearsay statements that are not admissible under Rules 803 or 804 if: "(1) the statement has equivalent circumstantial guarantees of trustworthiness; (2) it is offered as evidence of a material fact; (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and (4) admitting it will best serve the purposes of these rules and the interests of justice." Fed. R. Evid. 807.

In this case, there is little indicia of reliability or trustworthiness. A deposition usually is admissible on summary judgment if it is made on personal knowledge and sets forth facts that are admissible, or in other words, is at least as reliable as an affidavit. *See In re Sunset Bay Assoc.*, 944 F.2d 1503, 1510 (9th Cir. 1991); *see also* Fed. R. Civ. P. 32. The excerpt of Cuevas' deposition indicates that the 2013 deposition was conducted through an interpreter. However, there is no certification as to the accuracy of the interpretation included in the submission, or the credentials of the interpreter. ECF No. 801-10 at 2. Further, the EEOC provides no evidence to support the necessary foundation that, despite requiring an interpreter

to assist him during the 2013 deposition, Cuevas spoke and understood English well enough in 2004 to understand and accurately recall the English conversations that he claimed to be recounting approximately nine years later.  *See* Fed. R. Evid. 602.

What is more, Cuevas' testimony itself undermines its trustworthiness.  Many of Cuevas' responses indicate that he was struggling to recall the conversations at issue.  For instance, Cuevas acknowledged that he was "trying to remember" whether Schwartz was present for a conversation that Cuevas purported to replicate at length, even though he attested later in the deposition that both Schwartz and Orian had suggested in the same conversation that they would buy land on which to isolate Thai workers.  *See, e.g.,* ECF No. 801-10 at 17, 22.

In addition, many of Cuevas' responses were translated into statements that are vague, difficult to understand, or nonsensical, making it further unclear what Orian, Schwartz, Verbrugge, and Morford actually stated.  *See* ECF No. 801-10 at 8, 16−26.  The Court cannot determine from the excerpt of Cuevas' deposition upon which the EEOC mainly relies whether Cuevas is purporting to recall exact statements of the relevant Global and Growers managers or whether he is merely approximating the general content of a conversation he overheard nine years earlier in a language in which he may not have been proficient.  This exchange with questions by EEOC counsel is illustrative of that issue:

> Q.  Did he say why he wanted to have the Thai workers far away from the city and not have them speaking with others?

A.  So nobody would be able to communicate with them and then that way he changed the vision they had towards work on them.

Q.  I'm sorry.  I'm not so clear.

A.  No – may I be able to say it a different way?

Q.  No.  The concern was that who was going to influence whose view of work?

A.  The concern was that somebody can come and give them the information about the legal rights to the people and have friends that could let them know about a different lifestyle.  For some reason they wanted to keep them isolated to keep them always –

Q.  I'm sorry, please continue.

A.  And that way to have a secure labor.

ECF No. 801-10 at 23.

Moreover, the excerpt calls into question whether the exact language of what Cuevas is claiming about Orian, Schwartz, Verbrugge, and Morford said should be attributed to Cuevas, the declarant, or the unidentified interpreter whose certification and credentials are absent from the record.  In the criminal context, the Ninth Circuit considers four factors involving interpreters before reaching any Confrontation Clause or hearsay issues: (1) who supplied the interpreter, (2) whether the interpreter had a motive to mislead or distort, (3) the interpreter's qualifications, and (4) whether the defendant's subsequent actions were consistent with the translated statements.  *United States v. Nazemian*, 948 F.2d 522, 525−28 (9th Cir. 1991).  Even though this is a civil case, the Court would refer to those same factors by analogy to determine whether Cuevas' proffered statements have indicia of reliability.

However, the Court does not have the information to evaluate whether any of these factors is satisfied here and, considering the confused language of the proffered segments of the deposition, the Court does not find indicia of reliability or trustworthiness.

In sum, the EEOC has not met its burden to show that Cuevas' deposition statements are admissible as a hearsay exclusion or exception.  Significantly, the EEOC has not met its burden to show that the alleged statements by Orian, Schwartz, or Morford, or Verbrugge or Morford's alleged assertive conduct, are admissible through the conduit of Cuevas' inadmissible hearsay.  In addition, the Court finds that the proffered Cuevas deposition sections do not carry sufficient indicia of reliability to be allowed through any hearsay residual exception.   Fed. R. Evid. 807.  Nor has the EEOC laid a foundation regarding Cuevas' personal knowledge or language proficiency such that he could have understood, and recalled nine years later, third parties' English-language statements.  The Court will not consider Cuevas' proffered testimony, and finds that, consequently, the EEOC has failed to provide any evidence supporting that any of Growers' actions, or Global's actions as they affect Growers' liability, are on the basis of race or national origin.

### Effect of Default Judgment Order

Alternatively, the EEOC argues that this Court's prior default judgment against Global resolves the issue of whether Global intentionally discriminated against the Thai workers for purposes of this case, without a need to determine

whether race or national origin motivated the treatment or conduct. *See* ECF No. 757 at 8−11. Essentially, the EEOC asks the Court to leapfrog from Global's discrimination as articulated in the default judgment order to find that the Growers are liable for Global's discrimination and cannot challenge whether the EEOC actually satisfied their burden of proving that Global discriminated based on race or national origin.

"The law-of-the-case doctrine generally provides that 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *Musacchio v. United States*, 136 S. Ct. 709, 716 (2016) (quoting *Pepper v. United States*, 562 U.S. 476, 506 (2011)). The law of the case doctrine "applies most clearly where an issue has been decided by a higher court . . . ." *Askins v. United States Dep't of Homeland Sec.*, 899 F.3d 1035, 1042 (9th Cir. 2018). However, a district court "may have discretion to depart from the law of the case if: '1) the first decision was *clearly erroneous*; 2) an intervening change in the law has occurred; 3) the evidence on remand is substantially different; 4) other changed circumstances exist; or 5) a manifest injustice would otherwise result.'" *United States v. Cuddy*, 147 F.3d 1111, 1114 (9th Cir. 1998) (quoting *U.S. v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997) (emphasis added in *Cuddy*)). "Law of the case directs a court's discretion, it does not limit the tribunal's power." *Arizona v. California*, 460 U.S. 605, 618 (1983).

Federal Rule of Civil Procedure 54(b) provides that "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." A district court's exercise of its discretion under Rule 54(b) generally is guided by the law-of-the-case doctrine. *See* 18B C.A. Wright, et al., Fed. Practice & Proc. Juris. § 4478.1 (2d ed.).

In addition, a party generally is precluded, or collaterally estopped, from relitigating an issue adjudicated in an earlier proceeding if three requirements are met: (1) the issue decided at the previous proceeding is identical to the one that is sought to be relitigated; (2) the first proceeding ended with a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the first proceeding. *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 (9th Cir. 2006).

Issue preclusion bars "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment," even if the issue recurs in the context of a different claim. *Taylor v. Sturgell*, 553 U.S. 880, 892−93 (2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748−49 (2001)). The doctrine "has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting

judicial economy by preventing needless litigation." *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326 (1979). However, the Supreme Court has cautioned that district courts should exercise "broad discretion" in determining whether to apply issue preclusion in non-mutual and offensive settings, meaning where the later proceeding does not involve identical parties and where the party seeking preclusion invokes the doctrine as a sword rather than a shield. *See id.* at 331.

As the Supreme Court has recognized, "A person who was not a party to a suit generally has not had a 'full and fair opportunity to litigate' the claims and issues settled in that suit." *Taylor*, 553 U.S. at 892. "The application of claim and issue preclusion to nonparties thus runs up against the 'deep-rooted historic tradition that everyone should have his own day in court.'" *Id.* at 892−93 (quoting *Richards v. Jefferson Cty.*, 517 U.S. 793, 798 (1996) (internal quotation omitted)).

Accordingly, courts must take care to implement issue preclusion fairly. The Ninth Circuit has summarized the Supreme Court's "indices of unfairness" to guide the district court's exercise of its discretion:

> whether (1) "the plaintiff had the incentive to adopt a 'wait and see' attitude in the hope that the first action by another plaintiff would result in a favorable judgment" which might then be used against the losing defendant; (2) the defendant had the incentive to defend the first suit with full vigor, especially when future suits are not foreseeable; (3) one or more judgments entered before the one invoked as preclusive are inconsistent with the latter or each other, suggesting that reliance on a single adverse judgment would be unfair; and, (4) the defendant might be afforded procedural opportunities in the later action that were unavailable in the first "and that could readily cause a different result."

*Grisham v. Philip Morris, Inc.*, 670 F. Supp. 2d 1014, 1028-29 (C.D. Cal. 2009) (quoting *Syverson v. Int'l Bus. Machines Corp.*, 472 F.3d 1072, 1079 (9th Cir. 2007)).

Entry of default effects an admission of well-pleaded factual allegations against the defaulting party. *See Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977) (per curiam); *see also D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 107 (2d Cir. 2006) ("[Federal Rule of Civil Procedure] 55 tracks the ancient common law axiom that a default is an admission of all well-pleaded allegations against the defaulting party. Like all general provisions of the Federal Rules, Rule 55 is meant to apply to 'civil actions,' Fed. R. Civ. P. 2, where only the first step has been taken—i.e., the filing of a complaint—and the court thus has only allegations and no evidence before it.") (internal quotation omitted). "[N]ecessary facts not contained in the pleadings, and claims which are legally insufficient, are not established by default." *Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261, 1267 (9th Cir. 1992).

On February 18, 2015, Global and the EEOC stipulated to the entry of default and default judgment in favor of the EEOC and against Global because Global was unable to fund its defense. ECF No. 609. On February 24, 2015, Global and EEOC filed a supplemental motion clarifying that Global "stipulates to entry of default judgment against it regarding its liability for the EEOC's claims in this action." ECF No. 612 at 2. Global also stipulated to the Court's assessment of monetary and injunctive relief. *Id.* The Court entered default, noting that "Global is unable to

defend itself given its inability to fund its defense," and allowed the EEOC to renew its motion for default judgment and file an affidavit or other evidence in support of its claim for compensatory and punitive damages on behalf of the Claimants. ECF No. 613. The EEOC then filed voluminous additional filings in support of their damages claim, many of which the EEOC relies on to support the instant motions or to oppose the Growers' motions. *See* ECF No. 678.

At that juncture in the litigation, Growers already had been dismissed with prejudice because of a favorable judgment on their summary judgment motion and also had received a judgment in their favor awarding attorneys' fees. ECF Nos. 582 and 677. None of the default or default judgment orders was reversed by the Ninth Circuit on appeal. *See Glob. Horizons*, 915 F.3d at 642–43.

Despite the fact that at the time of Global's default judgment the Growers were no longer parties in this case, the EEOC argues that the Growers had an opportunity to contest the facts underlying the default judgment that the Court entered in 2015 against Global and argue that the Growers did not contest Global's liability at that time. ECF No. 747 at 7. Rather, the Growers filed a response on the record explicitly not taking "a position on any substantive issue before the Court on the EEOC's motion for default judgment against Global." ECF No. 651 at 4. The Growers further emphasized in their response that the Court had granted summary judgment in the Growers' favor, finding that they were not liable for any of the Title VII claims brought by the EEOC, a decision that was later reversed by the Ninth

Circuit, only then putting the Growers back into the case as parties.  ECF No. 651 at 2−3 (citing ECF No. 582).

For their part,  the Growers argue that since EEOC does not show that either Grower engaged in discriminatory conduct or created a hostile work environment based on a worker's race or national origin, any liability for either Grower is dependent, first, on Global's discriminatory conduct.  ECF No. 774 at 19−32; *see also* ECF No. 819 at 10−17.  On the issue of Global's conduct, the Growers argue that the EEOC does not show that any of the allegedly discriminatory behaviors were based on the Thai workers' race or national origin.  *See* ECF No. 774 at 40.  Even though Global stipulated to its own liability, the Growers argue that they should not be precluded from contesting whether the EEOC made a prima facie showing that Global's conduct toward the Thai workers was based on race or national origin because the Growers lacked a full and fair opportunity to litigate the issue themselves.  *See* ECF No. 743 at 8−11.

In the default judgment, the Court entered numerous findings of fact before concluding that compensatory and punitive damages were warranted.  Those findings of fact recounted malfeasance by Global in many forms:

1. Global intentionally recruited impoverished Thai workers for its labor contracts in the United States believing that they would be more manageable, less likely to complain about seizure of their passports, less work than promised, or delay in wages because they were desperate for the wages to pay off exorbitant recruitment fees mortgaged by their property and often, the property of their Thai relatives.
2. Global falsely promised Thai workers high wages and three years of steady employment.

3. Global engaged in deception and deceit to obtain H-2A guest worker visas for its contracts in the United States.

4. Prawnee Tubchumpol aka Som ("Prawnee") was Global's Director of International Relations acting as the liaison among Global, the Thai workers, and the Thai recruiting agents.

5. Upon arrival in the United States as part of the Global contract to provide workers in Washington, Thai workers were required to give their passports to the Global supervisors.

6. Global hired security guards to enforce its rules and monitor the activities of the Thai workers in Washington during 2004 and 2005.

. . .

9. Global supervisors Prawnee, Joseph, Monti, Chaiyot, and Charlie, among others, regularly and consistently harassed and intimidated the claimants with confiscation of passports, imposition of curfews, prohibition of contact with outsiders, threats of deportation to Thailand if they complained, violated Global rules against communication with outsiders, violated curfew, or tried to escape, and subjected the claimants to head count to confirm that no claimant had left. Threats included arrest and return to Thailand before completion of the contract with devastating financial results because of the high recruitment debt often secured by farms and property of the claimants and their families.

10. On one occasion, Global supervisor Charlie yelled at them and displayed a gun during a meeting with Thai workers after a visit by an attorney causing fear among the Thai workers. On another occasion, Mr. Thanakhum recalled that one of the Global supervisors made a motion as if he was shooting the Thai workers in the head.

11. Claimants were constantly pressured to work harder and faster always with the threat of return to Thailand without completion of the contract with all of the financial hardship that would cause them and their families.

12. Claimants were told not to talk to inspectors or attorneys and never to complain to either about working or living conditions with the same threat of return to Thailand.

13. Those same Global supervisors used insulting terms such as lizard and buffalo, both derogatory to Thais, and in particular, insulted those Thai workers from Issa, an agricultural area of northeastern Thailand as if they were lesser people.

14. One claimant, Mr. Nuansri, recalled that Chaiyot hit him with a cane while berating him to work faster. When he grabbed the cane causing Chaiyot to fall, he was retaliated against by reassignment to more difficult work alone.

15. The Thai workers were given more difficult work and paid less than Latino workers at the same work locations.
16. The claimants heard stories of fellow Thai workers who were sent back to Thailand for consorting with a local Laotian. They also saw that fellow workers who complained were then not given work for a week. Such stories reinforced the threats of Global supervisors to not communicate with outsiders.
17. The claimants were subjected to unsafe and overcrowded transportation when it was made available. Frequently, they were denied transportation to stores to buy food and to health care facilities for medical attention to injuries and illnesses.
18. Global rented living facilities away from the orchards. These facilities were substandard because they were too small for the number of claimants assigned to them resulting in overcrowding; these living quarters lacked adequate bathrooms and cooking appliances, were unsanitary, and were bug infested, making them virtually uninhabitable.
19. Frequently Global delayed payment of earned wages to the claimants causing financial hardship to them and their families.
20. Global's pattern and practice of hostile work environment, harassment, and discrimination as described above caused each of the claimants several or more of these reactions: financial distress, fear, anxiety, anger, intimidation, humiliation, shame, and a variety of physical issues including headaches, depression, loss of weight, sleeplessness, ulcers, and stomach aches and finally, an unrelenting sense of imprisonment.

ECF No. 679 at 4−7 (with the remaining findings addressing the award of compensatory and punitive damages for individual claimants against Global).

The EEOC urges this Court to apply all of the findings in the default judgment against Global to find liability against Growers in this action. However, the Court finds several defects in attributing Global's bad acts as identified in the default judgment against Growers.

First, the EEOC has not established a sufficient connection between Global and the Growers to establish that Global was acting as Growers' agent. The

evidence supports that Global was an independent employment agency completely separate from Growers. *See* ECF Nos. 776 at 11 (Green Acre Letter of Intent with Global); 777 at 17 (Valley Fruit contract with Global). Growers were Global's clients, not principals, in recruiting the Thai workers and managing the H-2A visa requirements. *See id.* Second, none of the default judgment's findings referred to actions by either of the Growers. The findings refer solely to Global and Global employees: Global supervisors Pranee, Joseph, Monti, Chaiyot, and Charlie. ECF No. 679 at 5; s*ee also* ECF Nos. 775 at 8; 795 at 25. The findings do not supply, nor does the EEOC independently submit, evidence supporting that either of the Growers knew or should have had known about Global's conduct off orchard. Nor do the findings refer to specific evidence in the record that supports that Global's conduct toward the Thai workers was based on race or national origin, rather than other factors such as the differences between treatment of H-2A workers, who all happened to be Thai, and domestic workers, some of whom happened to be Latino.

Third, this Court already had entered summary judgment in the Growers' favor approximately eight months before the EEOC and Global stipulated to default and default judgment. ECF Nos. 582 and 609. The issue of Global's liability for hostile work environment and disparate treatment was addressed by the default judgment, not through summary judgment and a presentation of facts, and only after Global was no longer putting forth a defense. *See* ECF No. 613 at 1; *Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261, 1267 (9th Cir. 1992) ("[N]ecessary facts not

contained in the pleadings, and claims which are legally insufficient are not established by default.").  Indeed, had the Growers still been parties to the case at that stage, the default judgment likely would have been impermissibly inconsistent with the judgment concerning the non-defaulting Growers, as the EEOC itself points out.  *See* ECF No. 793 at 68 (citing *Frow v. De La Vega*, 82 U.S. 552 (1872); *In re First T.D. & Inv., Inc.*, 253 F.3d 520, 532 (9th Cir. 2001); *Garamendi v. Henin*, 683 F.3d 1069, 1082−83 (9th Cir. 2012)).  Moreover, the EEOC has provided no evidence or authority that Growers would have had standing to object to entry of the default judgment or the stipulation of facts in their status at that point as a non-party.

Due process requires that a party be given notice and an opportunity to be heard before adverse action is taken against them.  *See Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and to afford them an opportunity to present their objections.").  The Growers were not parties in the case at the time that the default judgment adjudicated the discriminatory nature of Global's conduct, and, therefore, the Growers did not have an opportunity to be heard prior to remand.  After the Ninth Circuit reversed the summary judgment order that had been entered in favor of the Growers, and the case between the Growers and the EEOC resumed at the pleading stage with a Second Amended Complaint, the Growers must be afforded a full and

fair opportunity to litigate the issue of whether Global discriminated based on race or national origin themselves, as it relates to their own liability. *See Taylor*, 553 U.S. at 892.

The Court considers the serious due process concerns that would result from application to Growers of the default judgment against Global, especially in light of the absence of evidence supporting an agency relationship between the two. Therefore, the Court rejects applying any findings or conclusions in the prior order granting default judgment against Global as *res judicata* as to the liability of Growers for the EEOC's claims against them. *See* Fed. R. Civ. P. 55. Because of the same due process concerns, the Court rejects the application of offensive issue preclusion as to whether Global violated Title VII, as it relates to the Growers' liability in this action. *See Reyn's Pasta Bella, LLC.*, 442 F.3d at 746 (setting forth three relevant factors). The Court will not apply issue preclusion against the Growers as a sword, as the EEOC requests.

<u>Constructive Discharge Claims</u>

A claim alleging constructive discharge requires a showing that "a reasonable person in the plaintiff's position would have felt he or she was forced to quit because of intolerable or discriminatory work conditions." *Wallace v. City of San Diego*, 479 F.3d 616, 626 (9th Cir. 2007). The threshold for establishing a constructive discharge claim is higher than for a hostile work environment claim. *Manatt v. Bank of Am.*, 339 F.3d 792, 804 (9th Cir. 2003); *Brooks v. City of San Mateo*, 229 F.3d

917, 930 (9th Cir. 2000).  A plaintiff must "at least show some aggravating factors, such as a continuous pattern of discriminatory treatment."  *Thomas v. Douglas*, 877 F.3d 1428, 1434 (9th Cir. 1989) (emphasis in original removed).  Indeed, where an employee "fails to demonstrate the severe or pervasive harassment necessary to support a hostile work environment claim, it will be impossible for her to meet the higher standard of constructive discharge: conditions so intolerable that a reasonable person would leave the job."  *Brooks,* 229 F.3d at 930.

"[T]he determination of whether working conditions are sufficiently egregious to support a constructive discharge theory is usually a jury question."  *Brooks*, 229 F.3d at 930.  However, a constructive discharge claim fails as a matter of law where a reasonable trier of fact could not find that the employee was driven from the workplace.  *Id.*

The EEOC asserts that it pled constructive discharge claims for eleven individuals whose "fears and circumstances permit a jury to reasonably conclude that working conditions were so intolerable that leaving the orchards was justified under the circumstances."  ECF No. 793 at 66–67.  Even disregarding the plain language of the Second Amended Complaint, which refers only to a pattern-or-practice constructive discharge claim, ECF No. 705 at 83, the constructive discharge claims fail alongside the hostile work environment claim for lack of causal connection to a protected characteristic.  *Brooks,* 229 F.3d at 930.  In other words, the EEOC must provide sufficient evidence from which a reasonable jury could find

that the eleven claimants suffered intolerable work conditions because of their race or national origin.

In support of the constructive discharge claim, the EEOC submitted declarations by the eleven Thai workers identified as the constructive discharge claimants in the EEOC's response to the Growers' summary judgment motion. ECF Nos. 793 at 66; 794 at 97; 485-1; 620-5; 548-13; 485-6; 782-18; 485-9; 621-1; 782-10; 622-3; and 623-4. However, none of the claimants identified their race or national origin as the reason that they suffered an allegedly intolerable workplace. *See id.* Moreover, viewing the declarations cited by the EEOC itself in the light most favorable to the EEOC, the eleven individuals did not refer to pervasive or severe harassment that drove them from their work environments. Rather, they cited a fear of returning to Thailand without having made enough money to repay their recruitment fees. *See, e.g.,* (Duangkaew Khongchai, who worked at Valley Fruit, ECF Nos. 621-1 at 5, 11, "escaped in October 2005 because [he] found out that Global was going to send me back to Thailand and I needed to continue earning wages in the U.S. to support my family and pay my debts."). Some of the constructive discharge claimants also recalled that they had not been paid, but the EEOC did not provide evidence showing how long the workers had not been paid, or whether the length of time of nonpayment could be deemed as creating an intolerable work condition. *See* ECF Nos. 485-1 at 4, 8; 485-9 at 7; 548-13 at 37;

and 621-1 at 5, 11.  The EEOC provided no evidence tying the alleged concerns

articulated in the declarations to the declarants' race or national origin.

Viewing the evidence in the light most favorable to the EEOC, the Court finds

that there is insufficient evidence from which any reasonable juror could conclude

that the eleven claimants suffered intolerable work conditions on the basis of their

race or national origin.  Therefore, judgment shall be entered for the Growers on the

EEOC's constructive discharge claim or claims.

### *Joint Employer Status and Liability*

Having found insufficient evidence in the record to support that Global

discriminated based on race or national origin, there is no claim for which Growers

could be liable as joint employers.  However, through separate, partial motions for

summary judgment, the EEOC seeks a ruling "that Growers should have known that

Global or any other farm labor contractor needed to be monitored, but Growers

chose not to and are thereby liable."  ECF No. 747 at 8; *see also* ECF Nos. 715 and

722.  The EEOC adds that the Ninth Circuit opinion on appeal, combined with the

summary judgment record, compel the determination that "Growers ignored their

non-delegable duty to prevent and correct the discrimination, hostile work

environment, and constructive discharge that arose from Growers' failure to ensure

that Global provided the terms and conditions of employment that the Claimants

were entitled to receive under the H-2A program and under Title VII."  ECF No. 757

at 4; *see also* ECF No. 793 at 36 (citing *Glob. Horizons*, 915 F.3d at 640 and the

Ninth Circuit's finding that "Growers qualify as employers" for the proposition that the Growers are joint employers with Global as a matter of law).

The Growers' summary judgment motion disavows both joint employer status for off-orchard activity and liability for the Growers. ECF No. 774 at 33−36, 46−57. Growers conceded joint employer status for on-orchard activity for purposes of their summary judgment motion only. *See* ECF No. 826 at 23. Therefore, whether the Growers were joint employers for purposes of off-orchard activity is an issue in dispute for which the EEOC carries the burden to support.

An employee may have "more than one employer for Title VII purposes." *Glob. Horizons*, 915 F.3d at 637. In resolving the appeal in this matter, the Ninth Circuit adopted the common-law agency test to determine joint employment for Title VII cases. *Id.* at, 639.

Even if a joint employment relationship exists, an employer may be liable for its co-employer's discriminatory conduct "only if the defendant employer knew or should have known about the other employer's conduct and 'failed to undertake prompt corrective measures within its control.'" *See Glob. Horizons*, 915 F.3d at 641 (quoting EEOC, Notice No. 915.002, Enforcement Guidance: Application of EEO Laws to Contingent Workers Placed by Temporary Employment Agencies and Other Staffing Firms, 1997 WL 33159161, at *11 (Dec. 3, 1997). Therefore, the Court must apply a negligence standard to the issue of Green Acre and Valley

Fruit's liability for Global conduct: whether the Growers knew or should have known about Global's egregious conduct on- and off-orchard. *See id.*

The EEOC's partial summary judgment motions seek a determination that the Growers were liable as joint employers of Global. ECF Nos. 715 and 722. Since liability does not automatically follow a determination of joint employer status, the Court addresses joint employer status and liability as two separate inquires.

Joint Employer Status

The Ninth Circuit found that under the H-2A regulations in effect during 2004 and 2005, the Growers were the "employers" for the Thai workers brought to work on their farms under the H-2A program. *Glob. Horizons*, 915 F.3d at 640 (citing 20 C.F.R. § 655.100(b)). As the employers under the regulatory framework they were "legally obligated to provide the Thai workers with housing, meals, transportation, and wages." *Id.* at 641. The Ninth Circuit continued, "The Growers possessed ultimate authority over those matters, even though they delegated responsibility to Global Horizons and agreed to compensate Global Horizons for its services." *Id.* If the Growers were dissatisfied with the quality of Global Horizons' services, they could have demanded changes, withheld payment, or ended the contract with Global Horizons altogether." *Id.* Therefore, the Ninth Circuit concluded, the Growers were joint employers to the extent that they had the "power to control the manner in which housing, meals, transportation, and wages were provided to the Thai workers, even if never exercised . . . ." *Id.*

1    However, the Ninth Circuit was reviewing the case without a factual record.

2    Now that the factual record has been presented, the Court finds that there is

3    insufficient evidence to support the EEOC's theory that the Growers retained the

4    power to control the manner in which Global provided housing, meals,

5    transportation, and wages to the Thai workers.

6                          Joint Employer Liability

7            Within the context of a joint employer relationship, the defendant employer is

8    not liable for its co-employer's discriminatory conduct unless the "defendant

9    employer knew or should have known about the other employer's conduct and

10   'failed to undertake prompt corrective measures within its control.'" *See Glob.*

11   *Horizons*, 915 F.3d at 641 (quoting EEOC, Notice No. 915.002, Enforcement

12   Guidance: Application of EEO Laws to Contingent Workers Placed by Temporary

13   Employment Agencies and Other Staffing Firms, 1997 WL 33159161, at *11 (Dec.

14   3, 1997)).

15           For instance, in the context of a hostile work environment claim, an employer

16   is liable for the harassing conduct by a third party "'where the employer either

17   ratifies or acquiesces in the harassment by not taking immediate and/or corrective

18   actions when it knew or should have known of the conduct.'" *Freitag v. Ayers*, 468

19   F.3d 528, 538 (9th Cir. 2006) (quoting *Folkerson v. Circus Enters., Inc.*, 107 F.3d

20

21

754, 756 (9th Cir. 1997)).[6]  An employer's remedial obligations "'depend on its

ability to stop harassment by the person who engaged in harassment.'"  *Little v.*

*Windermere Relocation, Inc.*, 301 F.3d 958, 968 (9th Cir. 2001) (quoting *Ellison v.*

*Brady*, 924 F.3d 872, 882 (9th Cir. 1991)).  "In addition, 'if 1) no remedy is

undertaken, or 2) the remedy attempted is ineffectual, liability will attach.'"  *Id.*

The Growers argue that the timeframe is short during which the Growers

could have known about Global's conduct at a time during which they could have

initiated remedial action.  The Growers entered into contracts for Global's services

to hire workers in beginning in approximately January 2005.  *See* ECF Nos. 776 at

11; 777 at 17.  Many of the workers who made declarations on which the EEOC

relies for support arrived in summer 2005 and began leaving after the harvest.  *See,*

*e.g.,* ECF Nos. 485-6 at 7; 485-9 at 7.  L&I's investigation overlapped substantially

with the Thai workers' 2005 time period at the orchards.  *See* ECF No. 782-23.  Thai

workers Khadthan and Kongpia did not file charges of discrimination with the

EEOC until April 2006.   ECF Nos. 778-11 and 778-12.  Lastly, the contracts with

Global ended in October 2005 and November 2005 for Green Acre and Valley Fruit,

respectively.  ECF Nos. 776 at 7; 777 at 9.

---

[6] The Ninth Circuit cited to *Freitag*, 468 F.3d at 538, in determining that a
negligence standard should govern the issue of joint employer liability in this matter.
*Glob. Horizons*, 915 F.3d at 641.

1     Accordingly, even if the EEOC had submitted evidence that the Growers

2     knew or should have known of Global's actions, there was no more than a five-

3     month window, from July 2005 until November 2005, during which the Growers

4     could have received notice, investigated allegations, and fashioned a remedy.  Even

5     after extensive investigation, the EEOC has not submitted any evidence beyond

6     Cuevas' inadmissible statements that the Thai were disparately or adversely treated

7     on the basis of their race or national origin.  As discussed supra, the anecdotal

8     evidence by Thai declarants about their working conditions that EEOC submitted to

9     support the Growers' knowledge is insufficient to support that the Growers knew or

10    should have known of Global's actions or that any of Global's actions were on the

11    basis of race or national origin.  Moreover, the EEOC has provided little evidence

12    differentiating between the two separate defendants, Green Acre and Valley Fruit, as

13    to which entity would have received knowledge at what time.

## CONCLUSION

15    After reviewing all of the record and evidence in the light most favorable to

16    EEOC, the Court concludes that the EEOC has failed to submit competent evidence

17    from which a reasonable jury could find that Global or the Growers discriminated

18    against the Thai workers because of their race or national origin; or that Global or

19    the Growers created a hostile work environment for the Thai workers based on their

20    race or national origin; or that the Growers constructively discharged the Thai

21    workers by creating an intolerable work environment for them because of their race

or national origin; or that the Growers knew or should have known of Global's discrimination and disparate treatment of the Thai workers.

The Court finds that summary judgment for the Growers is appropriate.

Accordingly, **IT IS HEREBY ORDERED**:

1.      The Growers' Motion for Summary Judgment, **ECF No. 774**, is **GRANTED**.

2.      Plaintiff EEOC's Motions for Partial Summary Judgment, **ECF Nos. 715, 722, and 747**, are **DENIED**.

3.      The Growers' Motion for Partial Summary Judgment, **ECF No. 710**, is **DENIED AS MOOT**.

3.      Judgment shall be entered for Defendants Valley Fruit and Green Acre on all claims.

4.      The remaining schedule and hearings in this matter are **VACATED**, and any remaining motions are **DENIED AS MOOT**.

**IT IS SO ORDERED**.  The District Court Clerk is directed to enter this Order, provide copies to counsel, and **close this case**.

**DATED** March 20, 2020.

_____*s/ Rosanna Malouf Peterson*_____
ROSANNA MALOUF PETERSON
United States District Judge